# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00166-CR

**Jason Alan Arrick, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF WICHITA COUNTY, 89TH JUDICIAL DISTRICT NO. 36,807-C, HONORABLE JUANITA L. PAVLICK, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Jason Alan Arrick guilty of murder and assessed punishment at imprisonment for life and a $10,000 fine. Tex. Pen. Code Ann. ' 19.02 (West 2003). He brings forward eleven points of error complaining of the overruling of his motion to suppress evidence, the admission of expert opinion testimony, the admission of hearsay, and the overruling of motions for mistrial. We will overrule these points of error and affirm the conviction.

### Background

Appellant was romantically involved with Marian Rebecca Dow during the summer of 1999. In August of that year, Dow conspired with others to burglarize appellant=s parents= house on Carriage Lane in an unincorporated part of Wichita County, where appellant was then living. When appellant learned of Dow=s involvement in the burglary, he lured her to the house on Carriage Lane, where

he beat and fatally shot her. Appellant placed Dow=s body in the trunk of his Chrysler automobile and took it to a location in rural Oklahoma, where it was discovered in December 1999. Meanwhile, appellant began living with Sharon Davis at her house in Archer County. Appellant told several people that he had killed Dow and disposed of her body in Oklahoma, and this information eventually made its way to law enforcement officials.

## Search Warrants

In January 2000, warrants to search the house on Carriage Lane, the house in Archer County, and appellant=s Chrysler were issued and executed. Among the items seized at the Carriage Lane house were carpet samples shown by DNA tests to be stained with Dow=s blood. A .22 caliber handgun and bullets were found in the Archer County house. Hair found in the trunk of appellant=s Chrysler matched hair taken from Dow=s body.

By six points of error, appellant contends the district court should have suppressed all evidence seized during the execution of the three January 2000 search warrants. Except for the descriptions of the places to be searched, the warrants and supporting affidavits were virtually identical. We will describe the warrants and affidavits in greater detail in our discussion of the various points of error. The probable cause portion of the affidavits is attached as an appendix to this opinion.

### *Scope of Searches*

In point of error two, appellant urges that the property seized pursuant to the three search warrants was inadmissible because the seizures were outside the scope of the authorized searches. *See*

Tex. Code Crim. Proc. Ann. art. 18.04(2) (West 1977) (search warrant must describe place to be searched and identify that which is to be seized). Appellant=s contention is based on the following paragraph, contained in all three warrants, describing the authorized search: ANOW, THEREFORE, you are commanded to enter the suspected place and premises described in said Affidavit and to there search for the person described in said Affidavit and to seize him and bring him before me.@ Appellant asserts that the three warrants, by their terms, authorized the police to search for and seize only the person described in the supporting affidavits, that is, himself. *See id*. art. 18.02(11) (West Supp. 2003) (authorizing warrants to search for and seize persons). Appellant argues that because the warrants did not authorize the seizure of any property, all property seized during the execution of the warrants should have been suppressed.

A similar argument was made in *Faulkner v. State*, 537 S.W.2d 742, 744 (Tex. Crim. App. 1976). In that case, a search warrant directed officers Ato enter the suspected place described in said affidavit and seize same and bring it before me.@ *Id*. Read literally, the warrant only authorized the seizure of the premises to be searched. Noting, however, that the warrant incorporated the probable cause affidavit by reference, and that the affidavit demonstrated that there was probable cause to believe that marihuana could be found in the premises to be searched, the court concluded, ACommon sense . . . tells us that when the warrant orders the officer >to seize same= it is ordering the seizure of the contraband which formed the basis of the affidavit; that is, the marihuana.@ *Id*.

As in *Faulkner*, the search warrants before us incorporated the probable cause affidavits by reference. In each of the affidavits, the affiant stated his belief that appellant murdered Dow by shooting her and that evidence of that offense could be found in the vehicle or premises to be searched, specifically a

**3**

Ametal cross made out of the barrel of the weapon used to kill Dow, other parts, pieces or components of said weapon. Blood stains, clothing, and jewelry of deceased.@ When the search warrants and supporting affidavits are read in a common-sense manner, it is clear that the warrants ordered the seizure of the evidence described in the affidavits. Appellant=s contention that the warrants authorized only the seizure of his person is without merit. Point of error two is overruled.

Appellant makes three arguments in point of error four. First, he urges that, for want of probable cause, the three warrants were invalid insofar as they authorized the seizure of anything except Dow=s bloodstains. Based on this premise, appellant urges that the police exceeded the lawful scope of the warrants when they seized other materials. As we will discuss hereafter, we conclude that the search warrants were supported by probable cause in their entirety. Because we reject the premise on which it is based, no further discussion of this portion of point of error four is required.

Second, appellant asserts that the warrants authorized the police to search only for visible bloodstains. He contends the police exceeded the scope of the authorized searches when they used luminol, a chemical agent, to locate bloodstains at the Carriage Lane house that were not otherwise visible. The only authority appellant cites for this contention is a dictionary definition of Astain.@ It is a matter of common knowledge that criminals who commit bloody crimes commonly attempt to hide evidence of the crime by cleaning the scene. Under the circumstances, we conclude that the officers=use of luminol did not exceed the scope of the search authorized by the warrants.

Third, appellant argues that positive luminol tests did not justify the seizure of bloodstained carpet and wall paneling at the Carriage Lane house because the luminol test is merely a presumptive test for

**4**

blood. He asserts that absent positive identification of the stains as blood and, more particularly, as Dow=s blood, these seizures were not authorized by the warrant. Appellant again cites no authority to support this argument. We believe that under the circumstances shown here, the officers executing the Carriage Lane search warrant were reasonably justified in believing that the stains revealed by the luminol in the carpet and elsewhere were Dow=s blood. Point of error four is overruled.

*Probable Cause*

In three points of error, appellant contends the search warrants were not supported by probable cause. *See* Tex. Code Crim. Proc. Ann. arts. 1.06 (West 1977), 18.01(b) (West Supp. 2003) (search warrant must be supported by sworn statement of probable cause). With one minor exception, the same statement of probable cause was used in each of the three supporting affidavits. This statement is shown in the appendix.

Probable cause to support the issuance of a search warrant exists when the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises at the time the warrant is issued. *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986); *Hackleman v. State*, 919 S.W.2d 440, 447 (Tex. App.CAustin 1996, pet. ref=d, untimely filed). The sufficiency of a search warrant affidavit is determined by use of Atotality of the circumstances@ analysis. *Illinois v. Gates*, 462 U.S. 213, 234 (1983); *Hennessy v. State*, 660 S.W.2d 87, 90 (Tex. Crim. App. 1983); *State v. Bradley*, 966 S.W.2d 871, 873 (Tex. App.CAustin 1998, no pet.). Only the facts found

5

within the four corners of the affidavit may be considered.[1]  *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992).  Reasonable inferences may be drawn from the affidavit, however, and the affidavit must be interpreted in a common-sense and realistic manner.  *Lagrone v. State*, 742 S.W.2d 659, 661 (Tex. Crim. App. 1987); *Carroll v. State*, 911 S.W.2d 210, 216 (Tex. App.CAustin 1995, no pet.).

Appellate review of the sufficiency of an affidavit does not take the form of de novo review. Instead, the issuing magistrate=s probable cause determination must be given great deference by a reviewing court, and will be sustained so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.  *Gates*, 462 U.S. at 236; *Johnson v. State*, 803 S.W.2d 272, 289 (Tex. Crim. App. 1990); *Bradley*, 966 S.W.2d at 873.

### *Identity of body*

In point of error one, appellant contends the affidavit did not give the issuing magistrates probable cause to believe that Dow had been murdered, much less that the body found in Oklahoma was Dow=s.  At the time the search warrants were issued, Dow=s body had not been positively identified. Appellant argues, without citation to supporting authority, that Athe only evidence that would justify a finding of probable cause that the offense of murder had been committed against [Dow] was to have a positive forensic finding such as [a] fingerprint exam.@ This argument ignores the totality of the circumstances stated

---

[1]  In his brief, appellant repeatedly refers to testimony from witnesses at the suppression hearing or trial.  Appellant may not go behind the affidavits to impeach the facts stated.  *See Jackson v. State*, 365 S.W.2d 935, 938 (Tex. Crim. App. 1963).

in the probable cause affidavit and the inferences that may reasonably be drawn from the stated circumstances.

From the affidavit, the issuing magistrates knew that: (1) appellant had told several named individuals that he fatally shot Dow and disposed of her body in Oklahoma, (2) efforts to locate Dow had been unsuccessful, (3) a woman=s body had been found in nearby Jefferson County, Oklahoma, (4) this body had been shot with an unknown caliber firearm, and (5) jewelry identified as belonging to Dow had been found with the body. We conclude that the affidavit gave the issuing magistrates a substantial basis for believing that Dow had been murdered and that the body in Oklahoma was hers. Point of error one is overruled.

### Vehicle=s use in offense

In point of error six, appellant urges that the magistrate who issued the warrant to search the Chrysler did not have probable cause to believe that this vehicle was used in the commission of the offense. The Chrysler was described as being registered to appellant. The probable cause portion of the affidavit stated that: (1) appellant told a named witness that he transported Dow=s body to Oklahoma in a car, (2) appellant normally drove the Chrysler, and (3) he was driving the Chrysler on the day Dow was last seen alive. The inferences that may reasonably be drawn from these facts gave the magistrate a substantial basis for believing that the Chrysler was used in the commission of the offense. Point of error six is overruled.

*Location of items*

In point of error three, appellant contends the issuing magistrates did not have probable cause to believe that the material sought would be found in the places to be searched. The warrants ordered the officers to search the Carriage Lane house, described as the residence of appellant=s parents and his residence at the time of the murder; the Archer County house, described as appellant=s residence at the time the warrant issued; and appellant=s Chrysler automobile. Each warrant authorized the officers to search for and seize: (1) a metal cross made out of the barrel of the murder weapon, (2) other parts or pieces of the weapon, (3) Dow=s clothing, (4) Dow=s jewelry, and (5) Dow=s bloodstains. Appellant asserts that there was no probable cause to believe that items (1) through (4) would be found at the Carriage Lane house, at the Archer County house, or in his Chrysler. He urges that there was no probable cause to believe that Dow=s bloodstains would be found at the Archer County house or in the Chrysler.

The Carriage Lane house was, according to the probable cause affidavit, the murder scene, and even appellant concedes that the magistrate who issued the warrant to search that location had probable cause to believe that bloodstains might be found there. We have already found that the magistrate who issued the warrant to search appellant=s Chrysler had probable cause to believe that Dow=s body was transported to Oklahoma in that automobile. For that reason, the magistrate could reasonably infer that Dow=s blood might be found in the vehicle. The magistrate who issued the warrant to search the Archer County house could reasonably infer that appellant, when he shot Dow and disposed of her body, got Dow=s blood on his clothing. Because the Archer County house was appellant=s residence, the magistrate could reasonably infer that bloodstained clothing might be found there. We conclude that the magistrates

**8**

who issued the warrants to search the Chrysler and the Archer County house had a substantial basis for concluding that Dow=s blood might be found in those locations.

With respect to the metal cross, the pieces of the pistol, Dow=s clothing, and her jewelry, appellant argues that the fact officers applied for and obtained warrants to search three different places at the same time for these items demonstrates that they did not know where to find them. It was not necessary, however, for the police to know precisely where the material they sought was located; all that was required was probable cause to believe that the material might be found at the places to be searched. Although any one object, such as the metal cross, could not be in more than one place at the same time, the police might nevertheless have probable cause to believe that the object might be found at the Carriage Lane house, or at the Archer County house, or in the Chrysler. *See Massey v. State*, 933 S.W.2d 141, 148-49 (Tex. Crim. App. 1996) (affidavit gave magistrate probable cause to believe that evidence of offense was in defendant=s car or residence).

Appellant further argues that the information in the affidavits was stale. According to the affidavits, appellant began telling people in early October that he had killed Dow. He gathered Dow=s clothing and other personal items that same month. The affidavit was silent as to when appellant displayed the metal cross made from the murder weapon. The warrants were issued and executed in late January, over three months after the murder. Appellant urges that the magistrates did not have probable cause to believe that the metal cross, the other pieces of the murder weapon, and Dow=s clothing and jewelry might still be found in the places to be searched at the time the warrants issued.

9

Whether information is stale depends on the nature of the property and the other circumstances of the particular case. *Gonzales v. State*, 761 S.W.2d 809, 813 (Tex. App.CAustin 1988, pet. ref=d). The probable cause affidavits stated that appellant showed a named witness a metal cross and told him that it had been made out of the barrel of the weapon appellant used to kill Dow. The magistrates could reasonably believe that appellant, having taken the trouble to make it, would keep this reminder of his homicidal act. Although the affidavits contained no mention of the other parts of the murder weapon, the issuing magistrates could reasonably infer that if appellant had disassembled the murder weapon to fashion the cross, the remaining parts of the weapon might also be in his possession. Another named witness told the police that appellant had come to the witness=s residence within the preceding three months and taken clothing and Apersonal items@ belonging to Dow, giving the magistrates a basis for concluding that Dow=s clothing might be found in appellant=s possession. Because several items of jewelry were found with Dow=s body, the magistrates could infer that other jewelry might be included in the Apersonal items@ taken by appellant. Under the circumstances shown, we believe that the information in the probable cause affidavits was not so old as to undermine the magistrates= findings of probable cause. *See Bower v. State*, 769 S.W.2d 887, 903 (Tex. Crim. App. 1989) (finding substantial basis for issuance of warrant to search for evidence of murder committed more than three months earlier).

The metal cross and the other pieces of the pistol, the clothing, and the jewelry were objects that could easily be kept in any place to which appellant had access. Given appellant=s ties to the two houses and to the automobile that we have previously discussed, we conclude that the issuing magistrates

**10**

had a substantial basis for believing that the cross, the other pieces of the pistol, the clothing, and the jewelry might be found in any of these locations. Point of error three is overruled.

*Description of Items to be Seized*

Appellant=s last complaint regarding the search warrants is that they failed to describe the items to be seized with adequate precision. A search warrant must identify, as near as may be, that which is to be seized. Tex. Code Crim. Proc. Ann. art. 18.04(2) (West 1977). This requirement serves to define the proper scope of the search and protect citizens against the seizure of property the State has not shown itself entitled to possess. 40 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* ' 6.74 (2d ed. 2001) (hereinafter ADix@). As does appellant, we will address each item individually.

The first item to be seized was described as a Ametal cross made out of the barrel of the weapon used to kill Dow.@[2] The murder weapon is elsewhere described in the affidavit as a pistol. A cross fashioned from a pistol barrel is unusual, if not unique. Such a cross could easily be identified and distinguished from more common crosses. We conclude that this description was sufficiently specific to guide the police and properly limit the scope of the search.

The next item was described as Aother parts, pieces or components of said weapon.@ Once again, a pistol from which the barrel has been removed, and which has been otherwise disassembled, is unusual and easily distinguished from other weapons. We find this description adequate.

---

[2] In his brief, appellant erroneously states that the object was described only as a Ametal cross.@

**11**

The remaining items ordered seized were described as A[b]lood stains, clothing, and jewelry of deceased.@ Each of these items was Amere evidence.@ *See* Tex. Code Crim. Proc. Ann. art. 18.02(10) (West Supp. 2003). It has been suggested, but never held, that evidentiary search warrants must describe the property to be seized with greater particularity than warrants to search for the fruits or instrumentalities of a crime. Dix ' 6.76. Appellant urges that in this case, the warrants should have described the clothing and jewelry by size, type, design, color, and brand. As to the blood, he argues it should have been specifically described as either visible bloodstains or as trace evidence.

In the context of this case, the warrant to search the murder scene, the car used to dispose of the body, and the suspect=s current residence for the victim=s bloodstains was sufficiently precise. We are not persuaded that the warrant should have specified whether the officers were to look for and seize visible bloodstains, trace bloodstains, or both. With respect to the deceased=s clothing and jewelry, *any* item found in appellant=s possession would be of equal evidentiary value.[3] Under the circumstances, a more specific description would have been impossible.

We hold that the search warrants adequately described the items to be seized. Point of error five is overruled.

**Consent Search**

---

[3] Of course, items of clothing stained with the deceased=s blood would be of greater value, but the seizure of such clothing was authorized by the instruction to search for her bloodstains.

In February 2000, police conducted a second search of the Archer County house with Sharon Davis=s consent. During this search, they seized a pair of work boots and a pair of athletic shoes belonging to appellant. Presumptive blood tests were later performed on these shoes, and the results were positive. Appellant argues that the seizure of the shoes was unlawful because their incriminating nature was not immediately apparent.

An officer may seize items found in plain view if the officer was lawfully on the premises or otherwise properly in a position to view the object, and if it was immediately apparent to the officer that the item was evidence. *Horton v. California*, 496 U.S. 128, 134-36 (1990); *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991). Appellant argues that the seizure of two pairs of shoes Ashows that they had no idea as to what pair of shoes the Appellant wore on the day of the alleged murder.@ He also notes that the officers did not use luminol at the scene to determine if there was reason to believe the shoes had blood on them. For these reasons, appellant urges that it was not immediately apparent to the officers that the shoes were evidence of a crime.

The Aimmediately apparent@ prong of plain view analysis requires probable cause; it does not require actual knowledge of incriminating evidence. *Joseph*, 807 S.W.2d at 308. We have already held in our discussion of the search warrants that the police had probable cause to believe that appellant fatally shot Dow and disposed of her body. They also had probable cause to believe that Dow=s blood might be found on appellant=s clothing in the Archer County house. Because the police had probable cause to believe that Dow=s blood might be found on appellant=s shoes, their value as evidence was immediately apparent. Point of error seven is overruled.

**13**

## Scientific Evidence

*Blood*

One of the State=s forensic experts testified that she performed a presumptive test for blood on carpet, a carpet shampooer, wood paneling, and sheet metal taken from the Carriage Lane house, and on the work boots and athletic shoes taken from the Archer County house. In each instance, the test was positive.[4] In his eighth point of error, appellant contends the district court erred by admitting these presumptive test results. Specifically, appellant objected to the presumptive blood test results Aon the grounds that it=s not a reliable test to show anything, and the prejudicial value of it would substantially outweigh any probative value.@

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a qualified expert may testify thereto in the form of an opinion. Tex. R. Evid. 702. To be admissible under rule 702, expert testimony must be both relevant and reliable. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). If the proponent demonstrates by clear and convincing evidence that the proffered scientific evidence is both relevant and reliable, the trial court should admit it unless it determines that the probative value of the evidence is outweighed by some factor identified in evidence rule 403. *Id*. at 573; *see* Tex. R. Evid. 403 (exclusion of relevant evidence on special grounds).

---

[4] Later DNA tests indicated that the blood on the carpet was Dow=s. The amount of material on the other items was insufficient to permit DNA testing.

To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. Appellant argues that a presumptive test for blood is not reliable because it is not conclusive. We would agree with this argument if the State=s expert had testified that her test results were conclusive proof of the presence of blood. But she did not so testify, either at the *Kelly* hearing or before the jury. Instead, she testified that a presumptive test Ais a screening tool that lets us know that the sample that is on the piece of evidence is reacting the way blood would.@ She added that presumptive tests are used in the laboratory to determine whether further serological testing is justified. Appellant does not contend now, nor did he below, that the presumptive blood tests were not shown to be reliable for that purpose.

Appellant=s argument is primarily directed to the relevance of the presumptive blood tests. The district court accurately summarized appellant=s argument both there and in this Court: AThe only issue that [appellant] is raising . . . is whether or not this is relevant to the facts of the case, whether it will assist the jury in determining any fact issue, and whether if it does do that whether the prejudicial effect outweighs the probative value.@ Appellant urges that because the tests were merely presumptive for blood, and because a positive result did not necessarily prove the existence of blood, the test results did not aid the jury in resolving a factual dispute and were more prejudicial than probative. *See* Tex. R. Evid. 401 (defining Arelevant evidence@).

To be relevant, expert testimony must relate to the pertinent facts of the case. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000); *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim.

**16**

App. 1996). In this case, the presumptive blood tests were performed on carpet and other evidence found at the alleged murder scene, and on shoes belonging to appellant. Clearly, the expert testimony related to pertinent facts of the case. That blood was found, if only presumptively, at the alleged murder scene and on shoes belonging to appellant was a fact of consequence that would help the jury understand and weigh the evidence. Tex. R. Evid. 401, 702. That the test results were only presumptive went to the weight of the evidence rather than to its admissibility. As the court noted at the conclusion of the hearing, defense counsel demonstrated Athat he is able very effectively through cross-examination to show the limits of what these things prove and just how far it goes.@ The court did not abuse its discretion by concluding that the presumptive blood test evidence was relevant, and that the probative value of the evidence outweighed the danger of misleading or unfairly prejudicing the jury. Point of error eight is overruled.

*Hair*

Appellant also urges that the district court erred by admitting testimony by a forensic hair examiner that a hair found in the trunk of appellant=s car was similar to hair taken from Dow=s head. Appellant argues that the science or technique of hair comparison was not shown to be reliable because it was not shown to be capable of conclusively identifying the source of any given hair or even of determining a statistical probability that two hairs came from the same person. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) (criteria for determining reliability of opinion based on technical or specialized knowledge).

As in the case of the blood test evidence, appellant is questioning an expertise that the State=s witness did not claim to have. The witness testified that microscopic hair comparison Ais not

**17**

conclusive to . . . pinpoint the individual from which a hair originated . . . , but it is very good at excluding an individual.@ He testified that a comparison of the hair found in the trunk with hair taken from appellant conclusively showed that the unknown hair was not appellant=s. He testified that the unknown hair was similar to Dow=s hair in several respects: color, cuticle thickness, pigment granule size and distribution, and exterior damage. From this, he concluded that Dow could not be excluded as the source of the hair found in the car. He did not testify that the unknown hair was, in fact, Dow=s. Appellant=s argument does not address the reliability of hair comparison techniques for the purposes claimed by the State=s expert.

Once again, we believe that appellant=s argument is directed more to the relevance of the challenged testimony than to its reliability. The district court did not abuse its discretion by concluding that the expert=s opinion that the hair found in the trunk of appellant=s car could have been, but was not necessarily, Dow=s was a fact of consequence that would assist the jury. Tex. R. Evid. 401, 702. Point of error nine is overruled.

### Remaining Points

In point of error ten, appellant contends the court erred by overruling his motions for mistrial made after a witness repeatedly referred to extraneous crimes or misconduct by appellant. The witness in question was Kimberly Mims, one of appellant=s former girlfriends. During direct questioning by the prosecutor, Mims stated that appellant told her that he had been Adoing dope, dealing dope, cooking dope, selling dope.@ She also referred to a Arumor that [appellant] and I both had warrants out for our arrest for two guns that had been stolen from the house that I lived in on Harris Lane.@ On both occasions, appellant=s objection was sustained and the jury was instructed to disregard the witness=s statement. During

**18**

cross-examination, Mims said that appellant had stolen property from her and had Apulled guns on me@ during the times they lived together. Once again, the jury was instructed to disregard these statements. On each of these occasions, appellant made a motion for mistrial that was overruled.

Appellant notes that the district court granted his motion in limine asking that the State not offer evidence of extraneous crimes or misconduct without first obtaining a ruling on its admissibility. He urges that the State was guilty of prosecutorial misconduct because it failed to instruct Mims not to refer to extraneous matters when testifying.

A mistrial is called for when there is error so prejudicial that continuation of the trial would be futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). As a general rule, testimony erroneously referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Mims=s remarks were not directly responsive to any question she had been asked, and there is nothing in the record to suggest that the State deliberately sought to adduce extraneous misconduct evidence. On this record, the instructions to disregard were sufficient and the district court did not abuse its discretion by overruling the motions for mistrial. Point of error ten is overruled.

Appellant=s final point of error concerns the testimony of Courtney Cowardin. During the investigation of Dow=s murder, Cowardin told sheriff=s deputies that she overheard a conversation in which appellant told Richard Ondricek and Chastity Lowell that he shot Dow at his parents= house on Carriage Lane and then disposed of her body in Oklahoma. When the State asked Cowardin at trial about this overheard conversation, she said she could not remember what had been said. The prosecutor then sought

**19**

to question her about the content of the statement she had given to the deputies. Appellant objected that this was improper impeachment and took the witness on voir dire. In response to defense counsel=s questioning, Cowardin stated that she told the prosecutors before trial that she did not remember any of the conversation in question. Appellant then repeated his objection, adding that it was improper for the State to call a witness solely for the purpose of impeachment. Citing rule 613, the court overruled appellant=s objection, and the relevant portion of Cowardin=s statement to the deputies was thereafter read into evidence.

Cowardin=s out-of-court statement to the deputies was hearsay. *See* Tex. R. Evid. 801(d), (e)(1)(a). In the absence of an applicable hearsay exception, a witness=s prior inconsistent statement may be used to impeach the witness=s credibility but may not be used as primary evidence of guilt. *Jernigan v. State*, 589 S.W.2d 681, 692 (Tex. Crim. App. 1979); *see* Tex. R. Evid. 613(a). Even this limited use of a prior inconsistent statement is objectionable, however, if the primary purpose of calling the witness is impeachment with the otherwise inadmissible hearsay statement. *Ramirez v. State*, 987 S.W.2d 938, 944 (Tex. App.CAustin 1999, no pet.). A party may not call a witness it knows to be hostile for the primary purpose of eliciting otherwise inadmissible impeachment testimony, employing such a device as a subterfuge to avoid the hearsay rule. *Id.*; *Pruitt v. State*, 770 S.W.2d 909, 911 (Tex. App.CFort Worth 1989, pet. ref=d). The State concedes that Cowardin=s statement to the deputies was erroneously admitted.

**20**

Both Ondricek and Lowell testified.[5] During their testimony, each recounted the conversation in which appellant told them he killed Dow. Two other witnesses, Kimberley Mims and Roy Schenk, testified to other admissions of guilt by appellant. Under the circumstances, the erroneous admission of Cowardin=s hearsay statement did not affect a substantial right. Tex. R. App. P. 44.2(b). Point of error eleven is overruled.

The judgment of conviction is affirmed.


Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: April 24, 2003

Publish

---

[5] Both the prosecutor and defense counsel referred to the witness as AMs. Lowell,@ but she identified herself as Chastity Mason. We infer that Chastity Lowell and Chastity Mason are one and the same person.

On 17 Dec 99, in Jefferson County Oklahoma the remains of the a Caucasian female were found. On and or around the remains the following items were found. 1 ring with white and turquoise stone with a lighting bolt in the center, one horseshoe ring with blue colored stone, one class ring with red stone and one ring with turquoise colored stone. The body was wrapped in twin size fitted sheet with floral patterns. A Harley Davidson t-shirt with embroidery design on it. One beaded necklace.

On 20 Jan 00, Texas Ranger Richard Johnson was notified by former Wichita Falls police officer Mike Stecco that: he had made contact with an individual who had advised him that a murder had taken place in Wichita County. Stecco further advised that he had also notified Sgt. Kendall, Wichita Falls Police Department. Johnson then advised Lt. Cecil Yoder, WCSO that a murder had possibly occurred in the unincorporated area of Wichita County possibly at 8145 Carriage Lane, Wichita County, Texas.

On or about 21 Jan 00, the Wichita Falls Police Department, Texas Rangers and the Wichita County Sheriff=s Office began an investigation into the disappearance of Marion Rebecca Dow. The Oklahoma State Bureau of Investigation was notified and they advised that they had an unidentified body that was found on 17 Dec 99 in Jefferson County Oklahoma. Other attempts with various agencies to locate Dow met with negative results.

On 25 Jan 00, Courtney Cowardin was interviewed by Deputy Randy Elliott and Lt. Cecil Yoder. Cowardin advised essentially the following: Cowardin advised that she was at a residence on Kemp St. Wichita Falls, Texas, when she overheard a conversation between Jason Arrick, Richard Ondricek and Chasity Lowell. Arrick advised Lowell and Ondricek that he had shot and killed Rain at the shop behind Arrick=s parents residence at 8145 Carriage Lane Wichita County, Texas. Arrick then took the body to Oklahoma and put her in a ditch where she could not be found. Cowardin knew Rain to have been associated with Arrick and that Rain had assisted in a conspiracy to burglarize the residence at 8145 Carriage Lane.

On 26 Jan 00, Ed Briggs, OSBI, Lawton was interviewed by Sgt. David Duke and he advised essentially the following: The body found in Jefferson County Oklahoma was taken to the Oklahoma forensic lab in Oklahoma City for autopsy. The autopsy revealed that the victim was approx. 30 years old Caucasian female that was approx. 506 to 508 tall and had gap between her two front teeth. The victim had shoulder length dark hair. The victim had been shot with an unknown caliber firearm which entered in the back right shoulder blade and exited the left chest below the left nipple. The left collar bone of victim had been fractured sometime in victims

lifetime and had not healed properly. Briggs delivered to the WCSO photographs of the crime scene and items recovered at the scene.

On 26 Jan 00, George W. Holloway Jr. was interviewed by Duke and he advised essentially the following: After being shown a photograph of Dow by Duke Holloway identified the picture as the person he knew as Rain. Holloway further advised that a ring he had given her and was worn by Dow on her right thumb was a white and turquoise face with a lighting bolt dividing the colors. Duke then showed Holloway a photograph with four rings that were taken from the body in Oklahoma. Holloway identified the lighting bolt ring as the ring he gave to Dow. Holloway then produced a matching ring and left it with Duke. Holloway then advised that Dow often wore a Indian type bead necklace. Dow was shown a picture of a bead necklace that was found on the remains and he identified it as the one that Rain wore. Holloway also advised that in October of 1999 came to his residence in Burkburnett with Kim Mims and wanted to pick up the personal items of Dow. Arrick told Holloway that she won=t be back. Holloway told Arrick that if she did come back for her clothes he would send Dow over to Arrick=s to pick up her clothes. Arrick advised Holloway that Dow would not be back.

On 26 Jan 00, Richard Ondricek was interviewed by RK Johnson and Elliott and he advised essentially that Arrick told him that he had killed Dow at his parents house on Carriage Lane because she had set him up and burglarized his parents house. He further stated that Arrick showed him a cross that was made out of a pistol barrel. Arrick advised Ondricek that the barrel was from the gun he used to kill Dow.

On 26 Jan 00, Chasity Lowell was interviewed by RK Johnson and Elliott and she advised essentially that she was present during the conversation with Arrick and Ondricek and that Arrick told her the same as Ondricek.

On 26 Jan 00, Kimberly Ann Mims was interviewed by Sgt. Roger Kendall, WFPD and Detective Tony Fox WFPD and she advised essentially the following: On or about the first weekend of Oct 1999 Arrick picked her up and drove to his mothers house at 8145 Carriage Lane to pick up some photographs of his daughter. On the way to the house he told Mims that he had shot and killed a girl that he had been seeing by the name of Rain. He picked Rain up from work at Fantasy=s and drove to his mothers house on Carriage. When they arrived there they went into the living room where Jason=s common law wife, Sharon Davis was waiting. He proceeded to accuse her of having his mothers house broken into. He then told Dow that next time, before you fuck with someone you better know who you are fucking with. He then further accused Dow of being part of a burglary at the house and began pistol whipping her. Dow started telling Arrick that she loved him and begged to stop. Then Sharon told Arrick to shoot the bitch already and get it over with it. Arrick then took Dow out to the shop behind his house and shot her and she fell in the middle of

the shop floor, dead. Arrick then took the body and wrapped it up and put the body in a car and took the body to Oklahoma and dumped her in a ditch.

On 27 Jan 00, Sharon Davis was interviewed by Deputy Sgt. David Duke. She advised essentially the following: She and Arrick were at the residence of 8541 Carriage Lane, Wichita County, Texas, with Dow. Arrick was driving a red Chrylser convertible which he normally drives. Arrick and Davis took Dow to Maximus Gentlemen=s Club and left Dow there. Arrick then took Davis to her residence in Holliday, Texas, and then Arrick left. Davis has never seen Dow again since that night.[*]

It is affiant=s belief that the body found in Jefferson County Oklahoma is the body of Marion Rebecca Dow. It is further affiant=s belief that Jason Arrick caused the death of Dow by shooting her in the upper torso.

_____

* This paragraph appeared only in the affidavit supporting the warrant to search appellant=s car.

24