

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00335-CR

JEROME OVERSTREET                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

A jury found Appellant Jerome Overstreet guilty of capital murder, and the trial court assessed his punishment at life imprisonment. In seven points, Overstreet argues that insufficient evidence exists to sustain his conviction and that the trial court erred by overruling his motion to suppress evidence seized from his home pursuant to a search warrant. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Overstreet was married to Vicki Overstreet. They had a rocky marriage, and according to Vicki's friends and family, Overstreet was abusive and controlling. In September 2007, Vicki, fearing for her life, left Overstreet and her hometown of Wichita, Kansas and moved to Texas. She wanted to make a clean break from Overstreet, but after some time in Texas, she began talking to Overstreet again. He started occasionally visiting her on weekends at her apartment in Texas.

On Wednesday, November 6, 2007, Vicki told her sister Tammy Foster that she planned to tell Overstreet that she did not want to reconcile with him. On Thursday, Vicki told Tammy that when she broke the news to Overstreet, he became angry. That same day, Vicki talked to her daughter, Melissa Collins. Vicki told Melissa about her argument with Overstreet and said that Overstreet had told her that he was coming to Texas to get her.

Vicki did not show up for work on Friday or Saturday. Melissa was unable to reach her mother over the weekend, so she called Overstreet and asked if he had visited Vicki over the weekend; Overstreet told Melissa that he had not been in Texas and had not spoken to Vicki. Overstreet also told Vicki's son Lamont Webb that he had not talked to Vicki since the prior Thursday.

When Vicki did not show up for work on Monday morning, her employer called the police. Police officers went to her apartment to check on her. Her door was locked, so they got a key from management. The officers found Vicki

2

lying dead on the floor in her apartment. Her face was scratched, blood had run down her cheek from her left nostril, and her forehead and eye sockets were severely bruised. Her stomach was discolored and appeared to be bruised, her pants and underwear were down around her mid thighs, and her shirt was raised to expose the bottom half of her bra. Her left thigh appeared to have a bruise in the shape of a hand impression on it, and her wrists and arms were bruised. Officers saw traces of tape adhesive on her wrists and arms, but they did not find any tape in her apartment. The officers suspected that Vicki had been sexually assaulted.

The carpet appeared as if it had been freshly vacuumed because there were vacuum markings on it, yet officers could not find a vacuum in the apartment. In the bathroom trashcan, officers found a grocery store receipt from a nearby Kroger store in Euless that was for the purchase of a bottle of Riunite wine on Friday, November 9, 2007. The purchaser had used a debit card that was registered to Overstreet. A surveillance video from the Kroger store taken on November 9 confirmed that Overstreet had made the purchase. The bottle of wine was not found in the apartment. One wine glass was on the kitchen counter, and officers also found a box for two wine glasses matching the description of the glass they found, but they did not find the other matching glass.

Cell phone tower records for Overstreet's mobile phone number showed that, on Friday, November 9, phone calls were made from that number in Wichita at 6:13 a.m. and 6:50 a.m.; in Southaven, Kansas at 10:17 a.m.; in Edmond,

3

Oklahoma at 11:49 a.m.; in Sanger, Texas at 2:31 p.m.; and in Euless at 3:46 p.m. Several calls were made in the Euless area from that afternoon until 1:26 a.m. on Saturday morning, and the next call was not made until 7:39 a.m. on Saturday morning from Springer, Texas. By 12:08 p.m., calls were made from the Wichita area. According to Overstreet's employer, Overstreet clocked in to work on Wednesday, November 7, took vacation days on November 8 and 9, and next clocked in on Monday, November 12.

Euless detective Tony Bennett went to Wichita and interviewed Overstreet. Overstreet told Bennett that he had last spoken with Vicki on Friday, November 9, by telephone. Euless police officers worked with Wichita police officers to obtain a warrant to search Overstreet's house in Wichita. From Overstreet's house, officers seized a bottle of Riunite wine, a canister to a Dirt Devil vacuum, keys, papers with Overstreet's name on them, and an insurance policy in Vicki's name.

Crime lab testing on the contents of the vacuum's canister showed that carpet fibers and glitter found in the canister were chemically and microscopically the same as the carpet fibers and glitter found in the carpet of Vicki's apartment. Testing of three sections of carpet taken from Vicki's apartment showed a "strong presence" of semen; Overstreet's DNA was an identical match to the semen on two of the carpet cuttings, as well as to semen found on a pillowcase taken from the apartment. A partial male DNA profile was found on a second pillowcase,

4

which had been lying on Vicki's body when officers found her; the majority of Overstreet's DNA profile was present in the mixture on that pillowcase.

An examination of Vicki's body showed signs that Vicki's mouth and nose had been smothered and that Vicki may have been strangled. The medical examiner also saw evidence that Vicki had suffered blunt force trauma on her head, chest, abdomen, and thighs. The bruising on Vicki's thighs was consistent with someone forcing her legs apart. The medical examiner opined that Vicki had died of traumatic asphyxia. Vaginal swabs collected from Vicki's body tested weakly positive for semen, but further "confirmatory test[s]" were negative for semen.

### III. SUFFICIENCY OF THE EVIDENCE

In his first and third points, Overstreet complains about the legal sufficiency of the evidence. In his second and fourth points, he complains about the factual sufficiency of the evidence. Because the Texas Court of Criminal Appeals recently held in *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010), that there is no meaningful distinction between the factual sufficiency standard and the legal sufficiency standard, we analyze Overstreet's insufficiency arguments under only the legal sufficiency standard.

### A. Legal Sufficiency Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the

5

essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

### B. Law on Capital Murder

A person commits the offense of capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit

6

aggravated sexual assault. Tex. Penal Code Ann. §§ 19.02(b)(1), .03(a)(2) (Vernon 2003). A person commits the offense of aggravated sexual assault if he intentionally or knowingly causes the penetration of the anus or female sexual organ of another by any means without the person's consent and if, in the course of the same criminal episode, he causes serious bodily injury or attempts to cause the death of the victim. *Id.* § 22.021(a) (Vernon Supp. 2010).

### C. Sufficiency of the Evidence to Prove Capital Murder

In his first and second points, Overstreet argues that the evidence is insufficient to connect him to Vicki's death and that "[a]t best, the State proved that [he] visited [Vicki] on the weekend she was killed and took some items with him when he left." In his third and fourth points, Overstreet argues that the evidence is insufficient to prove that he committed the violent acts necessary to commit the offense of aggravated sexual assault as an element of capital murder.

The evidence presented at trial establishes that Overstreet drove to Euless on Friday morning, making various calls along the way and arriving sometime between 2:30 and 3:45 p.m. Overstreet purchased a bottle of wine at a store near Vicki's apartment around 3:30 p.m. that day, and the receipt for the wine ended up in a trash can in Vicki's apartment. However, when Vicki's daughter and son talked to Overstreet the following Monday, he told them that he had not been to see Vicki over the weekend. He told Lamont that he had not talked to Vicki since the prior Thursday, so Lamont was surprised when he saw the

7

surveillance videotape of Overstreet leaving the grocery store in Texas that Friday afternoon. Overstreet also told Detective Bennett that he had last spoken with Vicki on Friday by telephone. Thus, the evidence establishes that Overstreet went to see Vicki in Euless the weekend that Vicki was murdered and that he lied to her family and the police about being there.

The evidence also establishes that Overstreet and Vicki had a rocky marriage and that he was abusive towards her. Elaine Garcia, Vicki's friend and hairstylist, testified about an incident that occurred sometime around Christmas 2005 while Elaine was doing Vicki's hair at her house in Wichita. When Overstreet arrived home, Vicki asked Elaine not to leave her alone with him. Vicki followed Elaine outside when she was leaving, telling Overstreet that she was helping Elaine carry her things to her car. Overstreet began yelling at Vicki, so she got in the car with Elaine and left with no purse, phone, keys, or coat, despite the 13 or 14 degree weather.

Vicki's longtime friend, Dorothea Gamble, testified that Overstreet was controlling over and abusive toward Vicki. Dorothea explained that Vicki had stayed with her in August 2007 after she secretly left Overstreet. The weekend before Vicki's death, Vicki told Dorothea that Overstreet had visited her in Texas a few times.

Vicki's son Lamont testified that his mother and Overstreet had a rocky marriage and that Vicki had stayed with Lamont for a brief period before she moved to Texas. During that time, he or his wife would physically escort her to

8

and from her car and their apartment. According to Lamont, Vicki changed her phone number and planned to move to Texas without telling Overstreet. However, Vicki later told Lamont that Overstreet had visited her in Texas on weekends.

Vicki's sister and daughter both testified that a few days before Vicki's death, she and Overstreet had argued on the phone. According to Tammy, Vicki told Overstreet on Wednesday or Thursday that she did not want to reconcile with him, and Overstreet got angry at Vicki. Vicki sounded fearful and stressed when she talked to Tammy. According to Melissa, Overstreet told Vicki on Thursday that he was coming to Texas to get her.

When police discovered Vicki dead in her apartment, there were no signs of forced entry, and the deadbolt on her door and all of the windows were locked. A vacuum found in Overstreet's house contained carpet fibers and glitter matching those found in Vicki's apartment. Overstreet's DNA matched semen found on carpet cuttings and two pillowcases—one of which was found on Vicki's body—taken from her apartment.

Based on the evidence presented at trial, a rational jury could have concluded that Overstreet intentionally caused Vicki's death. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), .03(a)(2).

A rational jury also could have concluded that Overstreet had sex with Vicki without her consent and suffocated her in the course of the same criminal episode. *See id.* § 22.021(a). Overstreet admits that "a fair analysis of the

evidence indicates that he had sex with [Vicki] sometime prior to her death," but he argues that insufficient evidence shows that he committed the necessary violent acts for aggravated sexual assault. But in addition to Overstreet's semen found on the carpet around Vicki's body, Vicki's clothing was in disarray, with her underwear pulled down to her mid thighs, and there were multiple bruises on her body, including bruises on her thighs consistent with someone forcing her legs apart.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Overstreet murdered Vicki while in the course of committing or attempting to commit aggravated sexual assault. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. Accordingly, we overrule his first four points.

## IV. MOTION TO SUPPRESS

In his fifth, sixth, and seventh points, Overstreet argues that the trial court erred by overruling his motion to suppress evidence seized from his home pursuant to a search warrant and that his rights under the United States and Texas constitutions were violated because the search warrant was invalid.[2] He

---

[2]Overstreet urges us to determine that the Texas constitution provides greater protection than the United States Constitution. He cites *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991), for the proposition that Texas courts may find that defendants have greater rights under the Texas constitution than they have under the United States Constitution. However, Overstreet does not contend that Article I, § 9 of the Texas constitution and the Fourth Amendment of the United States Constitution differ in any material respect or explain how the Texas constitution provides any greater protection. Thus, we will examine

10

argues specifically that the supporting affidavit was too conclusory, contained "merely opinions," and set forth facts that had become stale by the time the search warrant issued.

## A. Law on Search Warrants and Standard of Review

A search warrant cannot issue unless it is based on probable cause as determined from the four corners of an affidavit. U.S. Const. amend. IV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. art. 18.01(b) (Vernon Supp. 2010) ("A sworn affidavit . . . establishing probable cause shall be filed in every instance in which a search warrant is requested."); *Nichols v. State*, 877 S.W.2d 494, 497 (Tex. App.—Fort Worth 1994, pet. ref'd).

Under the Fourth Amendment and the Texas constitution, an affidavit supporting a search warrant is sufficient if, from the totality of the circumstances reflected in the affidavit, the magistrate was provided with a substantial basis for concluding that probable cause existed. *Swearingen v. State*, 143 S.W.3d 808, 810–11 (Tex. Crim. App. 2004); *Nichols*, 877 S.W.2d at 497. Article 18.01(c) of the code of criminal procedure requires an affidavit to set forth facts establishing that (1) a specific offense has been committed, (2) the item to be seized constitutes evidence of the offense or evidence that a particular person

---

Overstreet's federal and state constitutional arguments together. *See Hogan v. State*, 329 S.W.3d 90, 93 (Tex. App.—Fort Worth 2010, no pet.) (citing *Arnold v. State*, 873 S.W.2d 27, 33 & n.4 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 830 (1994); *Garcia v. State*, 239 S.W.3d 862, 868 n.3 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd), *cert. denied*, 129 S. Ct. 505 (2008)).

committed the offense, and (3) the item is located at or on the person, place, or thing to be searched. Tex. Code Crim. Proc. Ann. art. 18.01(c); *see Tolentino v. State*, 638 S.W.2d 499, 501 (Tex. Crim. App. [Panel Op.] 1982). Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate in an affidavit, there is at least a "'fair probability'" or "'substantial chance'" that evidence of a crime will be found at the specified location. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13, 103 S. Ct. 2317, 2332, 2335 n.13 (1983)). The magistrate's action "cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239, 103 S. Ct. at 2333. Additionally, facts stated in an affidavit for a search warrant must not have become stale when the magistrate issues the search warrant. *Serrano v. State*, 123 S.W.3d 53, 60 (Tex. App.—Austin 2003, pet. ref'd); *Guerra v. State*, 860 S.W.2d 609, 611 (Tex. App.—Corpus Christi 1993, pet. ref'd); *see Sherlock v. State*, 632 S.W.2d 604, 608 (Tex. Crim. App. [Panel Op.] 1982).

When reviewing a magistrate's decision to issue a warrant, we apply a deferential standard in keeping with the constitutional preference for a warrant. *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007); *Swearingen*, 143 S.W.3d at 810–11; *Emenhiser v. State*, 196 S.W.3d 915, 924–25 (Tex. App.— Fort Worth 2006, pet. ref'd). We should interpret the affidavit in a commonsense and realistic manner, recognizing that the magistrate may draw reasonable inferences. *See Rodriguez*, 232 S.W.3d at 61; *see also Davis v. State*, 202

12

S.W.3d 149, 154 (Tex. Crim. App. 2006); *Nichols*, 877 S.W.2d at 498.

## B. Affidavit Provided Substantial Basis for Probable Cause Determination

Here, Detective Robert Chisholm of the Wichita Police Department prepared an affidavit to obtain a search warrant for Overstreet's residence. Detective Chisholm's affidavit, subscribed and sworn on November 16, 2007, alleged that Euless police had notified him that they were working on a homicide in Euless involving Overstreet's wife Vicki; that when they found Vicki dead in her apartment, her apartment door was deadbolted but her keys were inside the apartment; that the carpet in her apartment appeared to have been vacuumed, yet no vacuum was found in the apartment; that officers found a pair of white men's Roundtree-York underwear and some "yellowish latex gloves that did not appear to belong" in the apartment; that officers also found a November 9 receipt for the purchase of a bottle of wine from a Euless store but did not find a bottle of wine in the apartment; that officers tracked the debit card used for that purchase to Overstreet and recovered videotape surveillance from the store showing Overstreet wearing a black sweatsuit with a white stripe on it and making the wine purchase; and that Vicki's "very good friend" Gamble had told officers that Overstreet was very controlling and manipulative towards Vicki and had choked Vicki in the past to the point that she thought she was going to die. The search warrant affidavit further alleged that officers had probable cause to believe that certain evidence of the offense would be found in Overstreet's home, including a

13

bottle of Riunite wine, keys to Vicki's apartment, a black sweatsuit with a white stripe, Roundtree-York men's briefs, latex gloves, fingerprints, and other trace evidence. The magistrate issued a search warrant, which was executed that day.

Overstreet argues that the facts in the supporting affidavit were stale because of the time that had lapsed between when the officers found Vicki's body and when the search warrant issued. The search warrant was issued and executed on November 16, 2007, four days after officers found Vicki dead in her apartment and six days after cell phone records showed that Overstreet had driven from Euless back to Wichita. Considering the short lapse of time since the occurrence of the events and the nature of the items to be seized, it was not unreasonable to presume that the items sought from Overstreet's house remained there. *See Bower v. State*, 769 S.W.2d 887, 903 (Tex. Crim. App.) (finding substantial basis for issuance of warrant to search for evidence of murder committed more than three months earlier when that evidence was in defendant's possession seven days prior to warrant's issuance), *cert. denied*, 492 U.S. 927 (1989), *overruled on other grounds by Heitman*, 815 S.W.2d at 685 n.6; *Arrick v. State*, 107 S.W.3d 710, 718 (Tex. App.—Austin 2003, pet. ref'd) (upholding warrant based on affidavit seeking search of defendant's residences and automobile for evidence of murder that had occurred several months earlier).

Overstreet also argues that the affidavit is "conclusory in nature," "does not contain the necessary facts to support a finding of probable cause to search,"

and contains "merely opinions and not facts." But based on the facts contained in the affidavit, the magistrate knew that Vicki had been found dead in her apartment; that Euless police were working the case as a homicide; that Overstreet was Vicki's estranged husband who had a history of being controlling over and abusive to her; that he had been in Euless the weekend Vicki went missing; that he had purchased a bottle of wine from a nearby store, the receipt for which but not the bottle was found in Vicki's apartment; that Vicki's apartment door was deadbolted but her keys were inside; and that the carpet in her apartment had been vacuumed but no vacuum was found.

According deference to the magistrate's probable cause determination, and conscientiously reviewing the totality of the circumstances set forth in the affidavit, we conclude that the affidavit did not rely on conclusory statements such that the magistrate's probable cause determination was a "mere ratification of the bare conclusions of others." *See Gates*, 462 U.S. at 239, 103 S. Ct. at 2333. To the contrary, the affidavit contained sufficient information to allow the magistrate to conclude that there was at least a "'fair probability'" or "'substantial chance'" that evidence that Overstreet sexually assaulted and murdered Vicki would be found in Overstreet's house. *See id.* at 238, 243 n.13, 103 S. Ct. at 2332, 2335 n.13; *Flores*, 319 S.W.3d at 702. Accordingly, we hold that the trial court did not err by denying Overstreet's motion to suppress, and we overrule Overstreet's fifth, sixth, and seventh points.

15

## V. Conclusion

Having overruled Overstreet's seven points, we affirm the trial court's judgment.

                                        SUE WALKER
                                        JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 7, 2011

16