02-09-335-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00335-CR

 

 


 
 
 Jerome Overstreet
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 213th
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

 

A
jury found Appellant Jerome Overstreet guilty of capital murder, and the trial
court assessed his punishment at life imprisonment.  In seven points, Overstreet
argues that insufficient evidence exists to sustain his conviction and that the
trial court erred by overruling his motion to suppress evidence seized from his
home pursuant to a search warrant.  We will affirm.

II.  Factual and Procedural Background

Overstreet
was married to Vicki Overstreet.  They had a rocky marriage, and according to
Vicki’s friends and family, Overstreet was abusive and controlling.  In September
2007, Vicki, fearing for her life, left Overstreet and her hometown of Wichita,
Kansas and moved to Texas.  She wanted to make a clean break from Overstreet,
but after some time in Texas, she began talking to Overstreet again.  He started
occasionally visiting her on weekends at her apartment in Texas.

On Wednesday,
November 6, 2007, Vicki told her sister Tammy Foster that she planned to tell
Overstreet that she did not want to reconcile with him.  On Thursday, Vicki
told Tammy that when she broke the news to Overstreet, he became angry.  That
same day, Vicki talked to her daughter, Melissa Collins.  Vicki told Melissa
about her argument with Overstreet and said that Overstreet had told her that he
was coming to Texas to get her.

Vicki
did not show up for work on Friday or Saturday.  Melissa was unable to reach
her mother over the weekend, so she called Overstreet and asked if he had
visited Vicki over the weekend; Overstreet told Melissa that he had not been in
Texas and had not spoken to Vicki.  Overstreet also told Vicki’s son Lamont
Webb that he had not talked to Vicki since the prior Thursday.

When
Vicki did not show up for work on Monday morning, her employer called the police.
 Police officers went to her apartment to check on her.  Her door was locked,
so they got a key from management.  The officers found Vicki lying dead on the
floor in her apartment.  Her face was scratched, blood had run down her cheek
from her left nostril, and her forehead and eye sockets were severely bruised.  Her
stomach was discolored and appeared to be bruised, her pants and underwear were
down around her mid thighs, and her shirt was raised to expose the bottom half
of her bra.  Her left thigh appeared to have a bruise in the shape of a hand
impression on it, and her wrists and arms were bruised.  Officers saw traces of
tape adhesive on her wrists and arms, but they did not find any tape in her
apartment.  The officers suspected that Vicki had been sexually assaulted.

The carpet
appeared as if it had been freshly vacuumed because there were vacuum markings
on it, yet officers could not find a vacuum in the apartment.  In the bathroom
trashcan, officers found a grocery store receipt from a nearby Kroger store in
Euless that was for the purchase of a bottle of Riunite wine on Friday, November
9, 2007.  The purchaser had used a debit card that was registered to
Overstreet.  A surveillance video from the Kroger store taken on November 9
confirmed that Overstreet had made the purchase.  The bottle of wine was not
found in the apartment.  One wine glass was on the kitchen counter, and
officers also found a box for two wine glasses matching the description of the
glass they found, but they did not find the other matching glass.

Cell
phone tower records for Overstreet’s mobile phone number showed that, on
Friday, November 9, phone calls were made from that number in Wichita at 6:13
a.m. and 6:50 a.m.; in Southaven, Kansas at 10:17 a.m.; in Edmond, Oklahoma at
11:49 a.m.; in Sanger, Texas at 2:31 p.m.; and in Euless at 3:46 p.m.  Several
calls were made in the Euless area from that afternoon until 1:26 a.m. on
Saturday morning, and the next call was not made until 7:39 a.m. on Saturday morning
from Springer, Texas.  By 12:08 p.m., calls were made from the Wichita area.  According
to Overstreet’s employer, Overstreet clocked in to work on Wednesday, November
7, took vacation days on November 8 and 9, and next clocked in on Monday,
November 12.

Euless
detective Tony Bennett went to Wichita and interviewed Overstreet.  Overstreet
told Bennett that he had last spoken with Vicki on Friday, November 9, by
telephone.  Euless police officers worked with Wichita police officers to
obtain a warrant to search Overstreet’s house in Wichita.  From Overstreet’s
house, officers seized a bottle of Riunite wine, a canister to a Dirt Devil
vacuum, keys, papers with Overstreet’s name on them, and an insurance policy in
Vicki’s name.

Crime
lab testing on the contents of the vacuum’s canister showed that carpet fibers
and glitter found in the canister were chemically and microscopically the same
as the carpet fibers and glitter found in the carpet of Vicki’s apartment.  Testing
of three sections of carpet taken from Vicki’s apartment showed a “strong
presence” of semen; Overstreet’s DNA was an identical match to the semen on two
of the carpet cuttings, as well as to semen found on a pillowcase taken from
the apartment.  A partial male DNA profile was found on a second pillowcase,
which had been lying on Vicki’s body when officers found her; the majority of
Overstreet’s DNA profile was present in the mixture on that pillowcase.

An
examination of Vicki’s body showed signs that Vicki’s mouth and nose had been
smothered and that Vicki may have been strangled.  The medical examiner also
saw evidence that Vicki had suffered blunt force trauma on her head, chest,
abdomen, and thighs.  The bruising on Vicki’s thighs was consistent with someone
forcing her legs apart.  The medical examiner opined that Vicki had died of
traumatic asphyxia.  Vaginal swabs collected from Vicki’s body tested weakly
positive for semen, but further “confirmatory test[s]” were negative for semen.

III.  Sufficiency of the Evidence

In
his first and third points, Overstreet complains about the legal sufficiency of
the evidence.  In his second and fourth points, he complains about the factual
sufficiency of the evidence.  Because the Texas Court of Criminal Appeals
recently held in Brooks v. State, 323 S.W.3d 893, 895 (Tex. Crim. App.
2010), that there is no meaningful distinction between the factual sufficiency
standard and the legal sufficiency standard, we analyze Overstreet’s
insufficiency arguments under only the legal sufficiency standard.

A. 
Legal Sufficiency Standard of Review

In
our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact
is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).  Thus, when performing an evidentiary sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Williams v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@  Hooper v. State, 214 S.W.3d 9,
16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any
conflicting inferences in favor of the prosecution and defer to that
resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton,
235 S.W.3d at 778.

B.  Law
on Capital Murder

A
person commits the offense of capital murder if he intentionally causes the
death of an individual in the course of committing or attempting to commit
aggravated sexual assault.  Tex. Penal Code Ann. §§ 19.02(b)(1), .03(a)(2)
(Vernon 2003).  A person commits the offense of aggravated sexual assault if he
intentionally or knowingly causes the penetration of the anus or female sexual
organ of another by any means without the person’s consent and if, in the
course of the same criminal episode, he causes serious bodily injury or
attempts to cause the death of the victim.  Id. § 22.021(a) (Vernon Supp.
2010).

C.  Sufficiency of
the Evidence to Prove Capital Murder

 

In
his first and second points, Overstreet argues that the evidence is
insufficient to connect him to Vicki’s death and that “[a]t best, the State
proved that [he] visited [Vicki] on the weekend she was killed and took some items
with him when he left.”  In his third and fourth points, Overstreet argues that
the evidence is insufficient to prove that he committed the violent acts
necessary to commit the offense of aggravated sexual assault as an element of
capital murder.

The
evidence presented at trial establishes that Overstreet drove to Euless on
Friday morning, making various calls along the way and arriving sometime
between 2:30 and 3:45 p.m.  Overstreet purchased a bottle of wine at a store
near Vicki’s apartment around 3:30 p.m. that day, and the receipt for the wine
ended up in a trash can in Vicki’s apartment.  However, when Vicki’s daughter
and son talked to Overstreet the following Monday, he told them that he had not
been to see Vicki over the weekend.  He told Lamont that he had not talked to
Vicki since the prior Thursday, so Lamont was surprised when he saw the
surveillance videotape of Overstreet leaving the grocery store in Texas that
Friday afternoon.  Overstreet also told Detective Bennett that he had last
spoken with Vicki on Friday by telephone.  Thus, the evidence establishes that
Overstreet went to see Vicki in Euless the weekend that Vicki was murdered and
that he lied to her family and the police about being there.

The
evidence also establishes that Overstreet and Vicki had a rocky marriage and
that he was abusive towards her.  Elaine Garcia, Vicki’s friend and
hairstylist, testified about an incident that occurred sometime around
Christmas 2005 while Elaine was doing Vicki’s hair at her house in Wichita.  When
Overstreet arrived home, Vicki asked Elaine not to leave her alone with him.  Vicki
followed Elaine outside when she was leaving, telling Overstreet that she was
helping Elaine carry her things to her car.  Overstreet began yelling at Vicki,
so she got in the car with Elaine and left with no purse, phone, keys, or coat,
despite the 13 or 14 degree weather.

Vicki’s
longtime friend, Dorothea Gamble, testified that Overstreet was controlling over
and abusive toward Vicki.  Dorothea explained that Vicki had stayed with her in
August 2007 after she secretly left Overstreet.  The weekend before Vicki’s
death, Vicki told Dorothea that Overstreet had visited her in Texas a few
times.

Vicki’s
son Lamont testified that his mother and Overstreet had a rocky marriage and
that Vicki had stayed with Lamont for a brief period before she moved to Texas.
 During that time, he or his wife would physically escort her to and from her
car and their apartment.  According to Lamont, Vicki changed her phone number
and planned to move to Texas without telling Overstreet.  However, Vicki later
told Lamont that Overstreet had visited her in Texas on weekends.

Vicki’s
sister and daughter both testified that a few days before Vicki’s death, she and
Overstreet had argued on the phone.  According to Tammy, Vicki told Overstreet
on Wednesday or Thursday that she did not want to reconcile with him, and
Overstreet got angry at Vicki.  Vicki sounded fearful and stressed when she
talked to Tammy.  According to Melissa, Overstreet told Vicki on Thursday that he
was coming to Texas to get her.

When
police discovered Vicki dead in her apartment, there were no signs of forced
entry, and the deadbolt on her door and all of the windows were locked.  A
vacuum found in Overstreet’s house contained carpet fibers and glitter matching
those found in Vicki’s apartment. Overstreet’s DNA matched semen found on
carpet cuttings and two pillowcases—one of which was found on Vicki’s body—taken
from her apartment.

Based
on the evidence presented at trial, a rational jury could have concluded that
Overstreet intentionally caused Vicki’s death.  See Tex. Penal Code Ann.
§§ 19.02(b)(1), .03(a)(2).

A
rational jury also could have concluded that Overstreet had sex with Vicki
without her consent and suffocated her in the course of the same criminal
episode.  See id. § 22.021(a).  Overstreet admits that “a fair analysis
of the evidence indicates that he had sex with [Vicki] sometime prior to her
death,” but he argues that insufficient evidence shows that he committed the
necessary violent acts for aggravated sexual assault.  But in addition to
Overstreet’s semen found on the carpet around Vicki’s body, Vicki’s clothing
was in disarray, with her underwear pulled down to her mid thighs, and there
were multiple bruises on her body, including bruises on her thighs consistent
with someone forcing her legs apart.

Viewing
the evidence in the light most favorable to the jury’s verdict, we hold that a
rational trier of fact could have found beyond a reasonable doubt that
Overstreet murdered Vicki while in the course of committing or attempting to
commit aggravated sexual assault.  See Jackson, 443 U.S. at 326, 99 S.
Ct. at 2793; Clayton, 235 S.W.3d at 778.  Accordingly, we overrule his first
four points.

IV.  Motion to Suppress

In
his fifth, sixth, and seventh points, Overstreet argues that the trial court
erred by overruling his motion to suppress evidence seized from his home
pursuant to a search warrant and that his rights under the United States and
Texas constitutions were violated because the search warrant was invalid.[2]  He
argues specifically that the supporting affidavit was too conclusory, contained
“merely opinions,” and set forth facts that had become stale by the time the
search warrant issued.

A.  Law
on Search Warrants and Standard of Review

A
search warrant cannot issue unless it is based on probable cause as determined
from the four corners of an affidavit.  U.S. Const. amend. IV; Tex. Const. art.
I, § 9; Tex. Code Crim. Proc. Ann. art. 18.01(b) (Vernon Supp. 2010) (“A sworn
affidavit . . . establishing probable cause shall be filed in every instance in
which a search warrant is requested.”); Nichols v. State, 877 S.W.2d
494, 497 (Tex. App.—Fort Worth 1994, pet. ref’d).

Under
the Fourth Amendment and the Texas constitution, an affidavit supporting a
search warrant is sufficient if, from the totality of the circumstances
reflected in the affidavit, the magistrate was provided with a substantial
basis for concluding that probable cause existed.  Swearingen v. State,
143 S.W.3d 808, 810–11 (Tex. Crim. App. 2004); Nichols, 877 S.W.2d at
497.  Article 18.01(c) of the code of criminal procedure requires an affidavit
to set forth facts establishing that (1) a specific offense has been committed,
(2) the item to be seized constitutes evidence of the offense or evidence that
a particular person committed the offense, and (3) the item is located at or on
the person, place, or thing to be searched.  Tex. Code Crim. Proc. Ann. art.
18.01(c); see Tolentino v. State, 638 S.W.2d 499, 501 (Tex. Crim.
App. [Panel Op.] 1982).  Probable cause for a search warrant exists if, under
the totality of the circumstances presented to the magistrate in an affidavit,
there is at least a “‘fair probability’” or “‘substantial chance’” that
evidence of a crime will be found at the specified location.  Flores v.
State, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (quoting Illinois v.
Gates, 462 U.S. 213, 238, 243 n.13, 103 S. Ct. 2317, 2332, 2335 n.13
(1983)).  The magistrate’s action “cannot be a mere ratification of the bare
conclusions of others.”  Gates, 462 U.S. at 239, 103 S. Ct. at 2333.  Additionally,
facts stated in an affidavit for a search warrant must not have become stale
when the magistrate issues the search warrant.  Serrano v. State, 123
S.W.3d 53, 60 (Tex. App.—Austin 2003, pet. ref’d); Guerra v. State, 860
S.W.2d 609, 611 (Tex. App.—Corpus Christi 1993, pet. ref’d); see Sherlock v.
State, 632 S.W.2d 604, 608 (Tex. Crim. App. [Panel Op.] 1982).

When
reviewing a magistrate’s decision to issue a warrant, we apply a deferential
standard in keeping with the constitutional preference for a warrant.  Rodriguez
v. State, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007); Swearingen, 143
S.W.3d at 810–11; Emenhiser v. State, 196 S.W.3d 915, 924–25 (Tex.
App.—Fort Worth 2006, pet. ref’d).  We should interpret the affidavit in a
commonsense and realistic manner, recognizing that the magistrate may draw
reasonable inferences.  See Rodriguez, 232 S.W.3d at 61; see also
Davis v. State, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006); Nichols,
877 S.W.2d at 498.

B.  Affidavit Provided
Substantial Basis 

for Probable Cause Determination

 

Here,
Detective Robert Chisholm of the Wichita Police Department prepared an
affidavit to obtain a search warrant for Overstreet’s residence.  Detective Chisholm’s
affidavit, subscribed and sworn on November 16, 2007, alleged that Euless
police had notified him that they were working on a homicide in Euless
involving Overstreet’s wife Vicki; that when they found Vicki dead in her
apartment, her apartment door was deadbolted but her keys were inside the
apartment; that the carpet in her apartment appeared to have been vacuumed, yet
no vacuum was found in the apartment; that officers found a pair of white men’s
Roundtree-York underwear and some “yellowish latex gloves that did not appear
to belong” in the apartment; that officers also found a November 9 receipt for the
purchase of a bottle of wine from a Euless store but did not find a bottle of
wine in the apartment; that officers tracked the debit card used for that
purchase to Overstreet and recovered videotape surveillance from the store showing
Overstreet wearing a black sweatsuit with a white stripe on it and making the
wine purchase; and that Vicki’s “very good friend” Gamble had told officers
that Overstreet was very controlling and manipulative towards Vicki and had
choked Vicki in the past to the point that she thought she was going to die.  The
search warrant affidavit further alleged that officers had probable cause to
believe that certain evidence of the offense would be found in Overstreet’s
home, including a bottle of Riunite wine, keys to Vicki’s apartment, a black
sweatsuit with a white stripe, Roundtree-York men’s briefs, latex gloves, fingerprints,
and other trace evidence.  The magistrate issued a search warrant, which was
executed that day.

Overstreet
argues that the facts in the supporting affidavit were stale because of the
time that had lapsed between when the officers found Vicki’s body and when the
search warrant issued.  The search warrant was issued and executed on November
16, 2007, four days after officers found Vicki dead in her apartment and six
days after cell phone records showed that Overstreet had driven from Euless
back to Wichita.  Considering the short lapse of time since the occurrence of
the events and the nature of the items to be seized, it was not unreasonable to
presume that the items sought from Overstreet’s house remained there.  See
Bower v. State, 769 S.W.2d 887, 903 (Tex. Crim. App.) (finding substantial
basis for issuance of warrant to search for evidence of murder committed more
than three months earlier when that evidence was in defendant’s possession
seven days prior to warrant’s issuance), cert. denied, 492 U.S. 927
(1989), overruled on other grounds by Heitman, 815 S.W.2d at 685 n.6; Arrick
v. State, 107 S.W.3d 710, 718 (Tex. App.—Austin 2003, pet. ref’d)
(upholding warrant based on affidavit seeking search of defendant’s residences
and automobile for evidence of murder that had occurred several months earlier).

Overstreet
also argues that the affidavit is “conclusory in nature,” “does not contain the
necessary facts to support a finding of probable cause to search,” and contains
“merely opinions and not facts.”  But based on the facts contained in the
affidavit, the magistrate knew that Vicki had been found dead in her apartment;
that Euless police were working the case as a homicide; that Overstreet was Vicki’s
estranged husband who had a history of being controlling over and abusive to
her; that he had been in Euless the weekend Vicki went missing; that he had
purchased a bottle of wine from a nearby store, the receipt for which but not
the bottle was found in Vicki’s apartment; that Vicki’s apartment door was
deadbolted but her keys were inside; and that the carpet in her apartment had
been vacuumed but no vacuum was found.

According
deference to the magistrate’s probable cause determination, and conscientiously
reviewing the totality of the circumstances set forth in the affidavit, we
conclude that the affidavit did not rely on conclusory statements such that the
magistrate’s probable cause determination was a “mere ratification of the bare
conclusions of others.”  See Gates, 462 U.S. at 239, 103 S. Ct.
at 2333.  To the contrary, the affidavit contained sufficient information to
allow the magistrate to conclude that there was at least a “‘fair probability’”
or “‘substantial chance’” that evidence that Overstreet sexually assaulted and
murdered Vicki would be found in Overstreet’s house.  See id. at 238,
243 n.13, 103 S. Ct. at 2332, 2335 n.13; Flores, 319 S.W.3d at 702.  Accordingly,
we hold that the trial court did not err by denying Overstreet’s motion to
suppress, and we overrule Overstreet’s fifth, sixth, and seventh points.

V.  Conclusion

Having
overruled Overstreet’s seven points, we affirm the trial court’s judgment.

 

 

 

SUE WALKER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  April 7, 2011








 









[1]See Tex. R. App. P. 47.4.





[2]Overstreet urges us to
determine that the Texas constitution provides greater protection than the
United States Constitution.  He cites Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991), for the proposition that Texas courts may find that
defendants have greater rights under the Texas constitution than they have
under the United States Constitution.  However, Overstreet does not contend
that Article I, § 9 of the Texas constitution and the Fourth Amendment of the
United States Constitution differ in any material respect or explain how the
Texas constitution provides any greater protection.  Thus, we will examine
Overstreet’s federal and state constitutional arguments together.  See Hogan
v. State, 329 S.W.3d 90, 93 (Tex. App.—Fort Worth 2010, no pet.) (citing Arnold
v. State, 873 S.W.2d 27, 33 & n.4 (Tex. Crim. App. 1993), cert.
denied, 513 U.S. 830 (1994); Garcia v. State, 239 S.W.3d 862, 868
n.3 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d), cert. denied, 129
S. Ct. 505 (2008)).