Esquiel Fuentes RAMIREZ, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 03–97–00839–CR to 03–97–00841–CR.

Court of Appeals of Texas, Austin.

March 11, 1999.

Mark Westenhover, Austin, for Appellant.

Ronald Earle, Dist. Atty., C. Bryan Case, Jr., Asst. Dist. Atty., Austin, for State.

Before Chief Justice ABOUSSIE, Justices KIDD and PATTERSON.

MARILYN ABOUSSIE, Chief Justice.

Following a consolidated trial of three indictments, a jury found appellant Esquiel Fuentes Ramirez guilty of sexually assaulting his wife and seriously injuring his two infant daughters. *See* Tex. Penal Code Ann. §§ 22.021(a)(1)(A)(i), (2)(A)(ii) (West Supp. 1999) (aggravated sexual assault), 22.04(a)(1) (West 1994) (intentionally or knowingly caus-ing serious bodily injury to a child). The district court assessed punishment for the aggravated sexual assault at imprisonment for ten years. The court imposed two terms of life imprisonment for the intentional or knowing injuries to the children.

Appellant brings forward two points of error. First, he contends his trial attorney rendered ineffective assistance by failing to object to the inadmissible evidence on which his convictions rest. Second, appellant contends he was denied due process when the aggravated sexual assault offense was submitted to the jury after the State had announced during trial that it intended to dismiss that indictment. Because we agree that appellant did not receive effective assistance of counsel, we will reverse the judgments of conviction.

## BACKGROUND

### Norma Ramirez's out-of-court statements

On December 19, 1996, appellant was living with his wife Norma Ramirez, their three-year-old son Vinzent, and their twin seven-week-old daughters Vanessa and Valeri. While dinner was being prepared, Vanessa began to have seizures. Emergency medical service technicians were called and Vanessa was transported to the hospital. Upon examination, the child was determined to have subdural hemorrhaging of blood and other fluid, retinal bleeding, and multiple bilateral rib fractures. The medical testimony reflects that these are the classic symptoms of "shaken baby syndrome." Two weeks later, Valeri was also examined at the hospital. While she did not have broken ribs, she had similar subdural and retinal hemorrhaging. According to the medical testimony, both girls have permanent brain damage.

At the hospital on December 19, Norma was asked if Vanessa had been in a car accident or had been shaken. Norma said she had not, and then described an incident Norma said had taken place about one week earlier. Vinzent, the three-year-old, had been climbing on the bassinette in which the twins were resting. As he did so, he tipped the bassinette against the wall, causing a toy

truck to fall against Valeri. Appellant also recounted this incident during questioning by the police. On December 23, Norma gave a written statement to Austin police officer Mark Spangler in which she repeated the bassinette story. In this statement, Norma denied causing Vanessa's injuries. Norma acknowledged that appellant had a temper and had been known to push and slap her, but expressed the belief that appellant did not injure the child.

Norma Ramirez gave a second statement to Spangler on January 24, 1997. According to this statement, she was awakened by the twins at 3:30 a.m. on December 15, 1996. She got up and began to feed the girls. Vinzent, also awake, watched her as she did so. The commotion awakened appellant, who went to the living room and turned on the television. After being fed, Vanessa and Valeri went back to sleep. Norma then told appellant, who was still watching television, that she was going to take a bath. After Norma had been in the tub about twenty minutes, appellant entered the bathroom, briefly chatted with her, then left. He returned ten minutes later and asked "if I was ready." Knowing that appellant was referring to sexual intercourse, Norma told him that she was still sore and bleeding from the birth of the twins. Appellant became angry and began to pull Norma from the bathtub by her hair and arm. A violent struggle ensued during which appellant struck Norma on her head and side, threw her to the floor, and began to choke her. "He said that he wanted me right now." Appellant continued to hit Norma and throw her against the walls.

At some point, the struggle moved from the bathroom to the bedroom. Once, when attempting to hit Norma with his fist, appellant missed her and hit the wall, putting a hole in it. He also threw her against a window, breaking the glass with her head. Then, as Norma lay on the floor, appellant "got on top of me and was trying to have sex with me." Norma's screams awakened Vinzent and the twins, who began to cry. Appellant left Norma lying on the floor, walked over to the crib, and told the babies to "shut up." Then, he picked up Vanessa and held

her over his head. "He was yelling at her and telling her to shut up." Appellant "just kept shaking and shaking her.... He shook her until she stopped crying." After returning Vanessa to the crib, appellant picked up Valeri, held her over his head, and squeezed her "real tight." As he did this, appellant repeatedly kicked Norma and told her "it was my fault and that I was hurting them because I wouldn't do what he wanted me to do." After both girls were quiet, appellant returned to Norma. As Vinzent cowered under the girls' crib, appellant first forced his penis into Norma's mouth, then penetrated her vagina.

Norma spent the night on the floor. The next morning, appellant was "being real nice" to Vanessa and Valeri, who were "acting normal." Norma fed both girls and "didn't see that anything was wrong with them." She began to suspect that something was wrong about two days later, when the girls began to stop eating. When Vanessa had her first seizure, Norma called EMS. Norma said at the conclusion of the statement that she did not tell this story earlier because she was frightened.

Appellant was indicted and arrested on the strength of Norma Ramirez's January statement. On May 21, Norma wrote a letter to the assistant district attorney who was then handling appellant's prosecution and disavowed the January statement. She said that she had been told repeatedly by police officers and child welfare workers that appellant had injured her children, and that "I began to believe these accusations." In fact, said Norma in her letter, she did not see appellant abuse the children.

On August 21, Norma Ramirez gave another written statement, this time to the prosecutor who later would represent the State at appellant's trial. In this statement, she said that Officer Spangler had kept her in an interrogation room for nine hours, shouted at her, and told her that she could not return home until she gave a statement accusing appellant of raping her and injuring Vanessa and Valeri. The August statement goes on to describe a telephone call Norma said she received from a neighbor following appellant's arrest. The neighbor was crying and

told Norma that she knew appellant had not injured the girls. According to the statement, the neighbor told Norma that she had shaken the two girls while babysitting them about one week before Vanessa was taken to the hospital. The statement ends, "I never saw Zeke [appellant] shake or hit the twins. I never saw Zeke shake or hit Vanessa, except for minor spankings.... Zeke never sexually assaulted me."

### The trial

In his opening statement, the lead prosecutor told the jurors that there was no dispute that the two children had been seriously injured, and that the only real question was the identity of the person who inflicted the injuries. He went on, "You are going to hear that when Norma Ramirez was first interviewed about the injuries to Vanessa, who went to the hospital first ... she told police officers that she thought the injury might have happened because they have a son, a three year old son, Vinzent." After describing Norma Ramirez's December statements to the police, the prosecutor said that Norma later "went back to the police station and this time she told the police officers what I think really happened." Without objection, the prosecutor then summarized the January statement. The prosecutor went on to tell the jury that Norma later recanted this statement, claiming it had been coerced. "The bottom line," said the prosecutor, "is you are going to be ... the ones who have to decide whether Norma Ramirez's [January] statement ... is true or whether it was really honestly coerced from her."

The State's first witness was Norma Ramirez. She described the events of December 19, when Vanessa began having seizures. She recalled the questions she was asked first at the hospital and later by the police, and repeated the bassinette story. Asked by the prosecutor if her statement to Spangler on December 23 was true, Norma said it was. Norma was then asked if she recalled the statement she gave to Spangler on January 24. She said she did. She was asked how she came to give the statement. She explained, without objection, that Spangler "asked me if I would go with him to the police headquarters for a polygraph examina-

tion...." After several more questions relating to the polygraph, defense counsel objected "to all this polygraph examination here, Your Honor, as inadmissible." Without ruling on the objection, the court told the prosecutor not to go into the results of the examination and instructed the jury not to "consider anything about polygraph." The prosecutor then asked Norma if the polygraph examiner had asked her "whether you knew who had injured your children?" She said he had, and that she had answered, "I think I do." With that, said Norma, the polygraph examination ended and she was taken to an interview room where she was again questioned by Spangler.

In response to further questioning by the prosecutor, Norma confirmed that she gave Spangler a written statement during this interview but said that it was not voluntary. The prosecutor then showed Norma a copy of the January statement and asked her to "tell the jury ... what ... this statement says." Then, with prompting by the prosecutor, Norma began to relate the contents of her January statement. Defense counsel objected, "Your Honor, I'm going to object to this line of testimony. She has already testified this is not the truth. I don't understand where we are going with this, Your Honor." The court did not rule on this objection and the questioning continued. At one point, the prosecutor told Norma, "You don't have to read it [the statement]. You can summarize it if you want, as long as you summarize everything." Soon after, defense counsel objected, "Your Honor, I'm going to object to her reading from the statement again. She can testify to what she recalls." The court responded by telling the prosecutor, "I think you can read the sentence and ask her if she didn't say it." With that, the prosecutor began to read the January statement to Norma, stopping periodically to ask her, "Is that in there?" In this manner, the January statement was read to the jury with the only other objection by defense counsel being that the prosecutor was leading the witness. The objection was overruled.

After the January statement had been read to the jury in the fashion described, the prosecutor began to question Norma about

her assertion that the statement had been coerced. Norma testified that while she had been willing to take the polygraph exam, she had not wanted to give another written statement. She said that when she told Spangler that she wanted to leave, he threatened to arrest her. Norma said she was held in the interview room for nine hours and was not allowed to use the bathroom. She testified, "He kept on telling me that he knew that Zeke [appellant] had done it, then he came up to me and started yelling at my face. . . . And he was telling me if you don't tell me that he did it, if you don't start telling me what I want to hear, that I was going to go to jail." As this line of questioning continued, she was also asked about the May letter to the assistant district attorney and about the August statement in which she related the neighbor's alleged confession.. Norma testified that she did not have sexual intercourse with appellant against her will. Asked if it were true that "you don't know whether or not [appellant], your husband, abused the kids by shaking them," she answered, "That's true."

During his cross-examination of Norma Ramirez, defense counsel read exculpatory portions of her December and August statements, including her disavowals of any sexual assault or any knowledge of appellant shaking or injuring the twins. Asked by counsel if these statements were true, the witness said that they were.

Officer Spangler was later called to testify. Spangler was questioned about his initial investigation and about Norma Ramirez's original December statement. The prosecutor then asked that the December statement, January statement, May letter, and August statement be admitted in evidence. This request was granted after defense counsel said he had no objection.[1] The prosecutor then began to question the officer about the January statement. Spangler denied engaging in the coercive and threatening behavior testified to by Norma. When the prosecutor began to adduce the contents of the statement, defense counsel objected that the ques-

tioning was bolstering and cumulative. The objections were overruled. Without further objection, Spangler went on to repeat the contents of the January statement, including the description of the sexual assault and the shaking of the two infants by appellant. Spangler also testified that with Norma's consent, police searched the Ramirez residence on January 24. Photographs taken during the search show damage to the bathroom corresponding to the descriptions contained in Norma's statement.

It is unnecessary to summarize the remaining testimony. In the State's closing arguments, both prosecutors emphasized that the primary issue before the jury was the credibility of Norma Ramirez's January statement. One prosecutor argued, "As an officer of the Court we come before you and ask you to believe ... Norma Ramirez's statement, which you have heard a lot of evidence about, given to the police on January the 24th." The other prosecutor added, "So then ask yourself do we have any other statement anywhere that would indicate how those children were injured? The answer is yes, it's that January 24th statement."

### DISCUSSION

*Contention and standard of review*

Appellant contends Norma Ramirez's January statement was hearsay, and that trial counsel's failure to object to its admission or to request an instruction limiting the jury's consideration of the statement to impeachment constituted ineffectiveness of counsel. The State concedes the statement was hearsay, but argues that it was admissible under the hearsay exception for statements against penal interest. *See* Tex.R. Evid. 803(24). Alternatively, the State argues that counsel's failure to object or to request a limiting instruction was sound trial strategy. Moreover, the State contends that any alternative trial strategy would not have produced a different result.

We measure claims of ineffective assistance of counsel at the guilt stage against the

---

1. The exhibits had previously been marked as defense exhibits one through four. Thus, while they were admitted in evidence on the State's motion, they are referred to and appear· in the record as defense exhibits.

standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Crim. App.1986). The *Strickland* standard requires the defendant to show both that his counsel made serious errors and that those errors caused serious harm:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

■ In determining whether an appellant has satisfied the first element of the test, we decide whether the record establishes that counsel failed to provide reasonably effective assistance. *See id.* at 687–88, 104 S.Ct. 2052; *Hernandez*, 726 S.W.2d at 55; *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App. 1986). The appellant must demonstrate that counsel's performance was unreasonable under the prevailing professional norms and that the challenged action was not sound trial strategy. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). We do not evaluate the effectiveness of counsel in hindsight, but from counsel's perspective at trial. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim.App.1993); *Stafford*, 813 S.W.2d at 506. We assess the totality of the representation, rather than isolated acts or omissions. *E.g., Wilkerson*, 726 S.W.2d at 548. The court of criminal appeals has explained that we presume defense counsel provided reasonable professional assistance and the defendant must present proof to overcome this presumption:

Under the *Strickland* test, the defendant bears the burden of proving ineffective assistance. In addition, when reviewing a claim of ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "

*Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim.App.1994) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052); *Hernandez*, 726 S.W.2d at 55; *O'Hara v. State*, 837 S.W.2d 139, 143 (Tex.App.—Austin 1992, pet. ref'd). The standard of proof for ineffectiveness of counsel is a preponderance of the evidence. *See Moore v. State*, 694 S.W.2d 528, 531 (Tex.Crim.App.1985).

### Admissibility of the January statement

■ Norma Ramirez's January statement to Officer Spangler was offered in evidence by the State to prove the truth of the matters stated. As such, the statement was hearsay. Tex.R. Evid. 801(d).[2] The State does not dispute this, but urges that the statement was admissible under the exception to the hearsay rule for statements against penal interest. *See* Tex.R. Evid. 803(24). Citing *Fuentes v. State*, 880 S.W.2d 857, 861–62 (Tex.App.—Amarillo 1994, pet. ref'd), the State argues that the statement was against Norma's penal interest because it revealed that she did not protect her children from appellant even after she realized that he posed a danger to them.

■ To be admissible against a defendant under rule 803(24), a declarant's out-of-court statement inculpating the accused must be truly self-inculpatory as well. *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (interpreting Fed. Rule Evid. 804(b)(3)); *Cofield v. State*, 891 S.W.2d 952, 955–56 (Tex.Crim.App.1994) (interpreting rule 803(24)); *Drone v. State*, 906 S.W.2d 608, 612 (Tex.App.—Austin 1995,

2. In *Cuyler v. State*, 841 S.W.2d 933, 935 (Tex. App.—Austin 1992, no pet.), this Court held that an out-of-court statement by a sexual assault victim was an admission by a party opponent

and therefore not hearsay. This holding was justly criticized, and we subsequently disavowed it in *Halstead v. State*, 891 S.W.2d 11, 12 n. 1 (Tex.App.—Austin 1994, no pet.).

pet. ref'd). Whether a statement is in fact against the interest of the declarant must be determined from the circumstances of each case. *Drone*, 906 S.W.2d at 612.

In the hearsay statement at issue in *Fuentes*, the declarant stated that the defendant, her husband, told her the child victim's arm was broken, that she suspected the defendant had hurt the child, and that she knew the child needed medical attention. According to the statement, she did not take the child to a doctor because the defendant, whom she feared, told her not to and because she was afraid she would lose her other children. *Id.* at 860. The court of appeals, without mentioning *Williamson* (decided one month earlier), concluded that the statement exposed the declarant to criminal liability because she admitted that she knowingly failed to provide needed medical care to the child. *Id.* at 862.

Unlike the hearsay declarant in *Fuentes*, Norma Ramirez did not admit in her January statement that she knowingly failed to provide needed medical treatment to her daughters. To the contrary, the statement reflects that the girls acted normally immediately after the injurious shaking and that Norma did not fully appreciate the need for medical care until Vanessa had a seizure. Further, the statement did not expose Norma to criminal liability for failing to remove her daughters from appellant's presence before the shaking incident took place. Nothing in the statement indicates that Norma knew or had reason to believe that appellant posed a danger to her children before the night in question. According to the statement, appellant was "real nice" to the girls even after the shaking incident. The statement does not so clearly tend to subject Norma to criminal liability as to support the conclusion that she would not have made the statement unless she believed it to be true. Instead, the statement vividly portrays Norma and the children as victims of appellant's rage, and places all blame for the children's injuries on appellant. The State's argument that the statement was admissible under rule 803(24) is without merit.

█ In the absence of an applicable hearsay exception, a witness's prior inconsistent statement may be used to impeach the witness's credibility but cannot be used as primary evidence to prove guilt. *Jernigan v. State*, 589 S.W.2d 681, 692 (Tex.Crim.App. 1979); *Smith v. State*, 520 S.W.2d 383, 386 (Tex.Crim.App.1975); *see* Tex.R. Evid. 613(a). But in these causes, even this limited use of the January statement was objectionable because it is obvious that the State called Norma Ramirez as a witness primarily for the purpose of impeaching her with the otherwise inadmissible hearsay statement. *See Adams v. State*, 862 S.W.2d 139, 148 (Tex. App.—San Antonio 1993, pet. ref'd); *Sills v. State*, 846 S.W.2d 392, 396–97 (Tex.App.— Houston [14th Dist.] 1992, pet. ref'd); *Zule v. State*, 802 S.W.2d 28, 34 (Tex.App.—Corpus Christi 1990, pet. ref'd); *see also Barley v. State*, 906 S.W.2d 27, 37 n. 11 (Tex.Crim.App. 1995).

> When a party calls a witness knowing that the witness will provide no useful testimony, and then adduces a prior inconsistent statement, he must be doing so in the hope that the jury will make substantive use of the prior statement. If the jury uses the evidence properly (that is, for impeachment purposes only), the best the party can do is to neutralize the witness's testimony.... The party can profit from calling the witness only if the jury misuses the evidence by considering it for the truth of the matter asserted. In this situation then, the prejudicial value of adducing the prior inconsistent statement must outweigh its probative value.

1 Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, *Guide to the Texas Rules of Evidence: Civil and Criminal* § 607.2, p. 554 (Texas Practice 2d ed.1993). The prosecution may not call a witness it knows to be hostile for the primary purpose of eliciting otherwise inadmissible impeachment testimony, employing such a device as a subterfuge to avoid the hearsay rule. *Pruitt v. State*, 770 S.W.2d 909, 911 (Tex.App.—Fort Worth 1989, pet. ref'd) (citing *United States v. Hogan*, 763 F.2d 697, 702 (5th Cir.1985)).

### Counsel's performance

█ Generally, we will not speculate about counsel's trial strategy. *See Jackson*,

877 S.W.2d at 771; *Delrio v. State,* 840 S.W.2d 443 (Tex.Crim.App.1992). An appellant, however, may rebut the presumption of effectiveness if it can be determined from the record that trial counsel's performance was not based on sound strategy. *See Jackson,* 877 S.W.2d at 771–72; *Bohnet,* 938 S.W.2d 532, 536 (Tex.App.—Austin 1997, pet. ref'd). In these causes, the record demonstrates that no plausible purpose was served by counsel's failure to object to Norma Ramirez's January statement.

The January statement is the only evidence in the record supporting appellant's conviction for aggravated sexual assault. Although the State introduced photographs showing the damage in the bathroom and bedroom of appellant's house, this evidence is significant only if it is considered together with the statement. Standing alone, the physical condition of the house does not prove any element of aggravated sexual assault. The January statement is also the principal evidence supporting appellant's convictions for injuring his two daughters. Other, properly admitted evidence supports the conclusion that the children were violently shaken by an adult and that appellant had access to the children during the time period the injuries were inflicted. But other adults were also shown to have had the opportunity to inflict the injuries, and the January statement is the primary evidence specifically identifying appellant as the abuser.[3] Other than the unobjected-to hearsay, only a few circumstances suggest appellant's guilt: appellant has a violent temper, he was reluctant to call EMS after Vanessa had her seizure, and he did not immediately go to the hospital. The importance of the January statement to the State is evidenced by the

emphasis placed on it by the prosecutors throughout the trial.

The State argues that appellant's counsel was pursuing a strategy aimed at destroying Norma Ramirez's credibility. "It can be discerned from the record," argues the State, "that trial counsel, in allowing in the damaging hearsay, sought to discredit the main witness against his client." The flaw in this argument is that Norma did not testify against appellant. To the contrary, her trial testimony was that appellant did not injure the children. She was not even questioned about the sexual assault until after the January statement was read to the jury, and she then denied that it took place. It was the State, not appellant, who needed to impeach Norma Ramirez's trial testimony. And it was the State, not appellant, who benefitted from the introduction of the January statement.

The State cites two opinions it contends support its argument that counsel was pursuing a sound trial strategy. *See Reed v. State,* 885 S.W.2d 275 (Tex.App.—Beaumont 1994, no pet.); *Trevino v. State,* 783 S.W.2d 731 (Tex.App.—San Antonio 1989, no pet.). In both of these sexual assault prosecutions, defense counsel failed to object to the admission of prejudicial hearsay testimony, and on appeal the claim was made that this failure constituted ineffectiveness. The courts of appeals rejected this argument, holding in both cases that counsel's failure to object could be justified as trial strategy. In both opinions, however, the courts note that the hearsay in question was cumulative of other evidence. *See Reed,* 885 S.W.2d at 280; *Trevino,* 783 S.W.2d at 733. This distinguishes the cited opinions from the causes before us. It is the absence of other probative evidence

---

**3.** The only other evidence identifying appellant as the person who injured the two girls is State's exhibits 30 and 31. Exhibit 30 is a worksheet prepared by Norma Ramirez during a parenting class she took in hope of obtaining the return of her children. In it, she wrote, "My twin daughters were shaken. Vanessa & Valeri were the victims the person responsible is Zeke Ramirez." Exhibit 31 is a letter Norma wrote to her son Vinzent, also during the class. The letter states, "You were taken from me because Vanessa and Valeri were abused. Your dad is responsible for the abuse." Like Norma's January statement,

these documents were hearsay. And like that statement, these exhibits were admitted in evidence without objection by defense counsel. Everything said in this opinion regarding counsel's failure to object to the January statement is fully applicable to his failure to object to exhibits 30 and 31.

A police victim services counselor testified that Norma told her that her husband had beaten her and her children, causing injury to a child. On its own motion, the district court instructed the jury to consider this hearsay testimony for impeachment only.

of appellant's guilt that makes it impossible to characterize counsel's failure to object to the hearsay evidence as trial strategy.

The Tenth Court of Appeals reviewed a similar record in *Owens v. State,* 916 S.W.2d 713 (Tex.App.—Waco 1996, no pet.). At the defendant's trial for aggravated assault, the complaining witness testified that she had fabricated her accusations against the defendant and named a different person as her attacker. The prosecutor was then allowed, without objection or request for limitation, to impeach the witness with her written statement to the police. The statement was then offered and admitted in evidence, again without objection by the defense. After concluding that the out-of-court statement was admissible only for the limited purpose of impeachment, the court of appeals wrote:

> The record demonstrates that defense counsel failed to object or ask for a limiting instruction when the prosecutor asked [the witness] to acknowledge that she had previously alleged that Owens caused her bodily injury by beating her with a wooden club. He further failed to object or request a limiting instruction when the prosecutor offered both [the witness's] written statement and her signed complaint for admission, resulting in the admission of both documents for all purposes. Defense counsel's course of conduct cannot be considered sound trial strategy. There is no plausible strategy to pass over the admission of the only evidence of a defendant's guilt which is also clearly inadmissible as substantive evidence. Because defense counsel failed to object or request a limiting instruction to the only evidence that the jury could consider to convict his client, we find that his performance fell below the objective standard of reasonableness under prevailing professional norms.

*Id.* at 718–19 (quotation marks and citations omitted).

Like the *Owens* court, we conclude that there is no plausible trial strategy by which to excuse defense counsel's failure to object to the admission of Norma Ramirez's January statement, which was the principal evidence of his client's guilt. Counsel's failure to object to this obvious hearsay, or even to request an instruction limiting the jury's consideration of the statement to impeachment, was an error so serious that he was not functioning as the "counsel" guaranteed by the United States and Texas constitutions. The first prong of *Strickland* is satisfied.

**Prejudice**

 Having found that counsel's performance at trial was constitutionally deficient, we turn to the question whether this deficient performance prejudiced the defense and deprived appellant of a fair trial, *i.e.,* whether there is a reasonable probability the result of the trial would have been different but for counsel's unprofessional errors. *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As previously discussed, the only evidence to sustain appellant's conviction for aggravated sexual assault is the January statement. Had counsel been functioning effectively, this statement would not have been admitted in evidence or, at most, would have been admitted only for impeachment and not as substantive evidence of guilt. In either event, the result of the sexual assault prosecution would certainly have been different but for counsel's unprofessional errors. *See Owens,* 916 S.W.2d at 719. The January statement is also the primary evidence sustaining appellant's convictions for injury to the children. Only this statement and the other unobjected-to hearsay documents discussed in footnote three positively identify appellant as the person who inflicted the injuries to Vanessa and Valeri. Without this hearsay evidence, appellant is shown as only one of several adults who had the opportunity to commit the crimes. Under the circumstances, the gravity of counsel's errors is sufficient to undermine confidence in the outcome of these prosecutions. *See id.* The second prong of *Strickland* is satisfied.

Appellant's first point of error is sustained. We need not address the second point. The judgments of conviction are reversed and the causes are remanded to the district court.