PD-0963-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/27/2015 10:03:04 PM
Accepted 8/28/2015 12:10:55 PM
ABEL ACOSTA
CLERK

No. PD-0963-15

## TO THE COURT OF CRIMINAL APPEALS OF TEXAS

**AJAH FOSTER**
*Appellant*

v.

**THE STATE OF TEXAS,**
*Appellee*

_____

## PETITION FOR DISCRETIONARY REVIEW
_____

On Petition For Discretionary Review from the Fourteenth Court of Appeals
Cause No. 14-13-01068-CR, affirming the judgment in
Cause No. 1388752 from the 184th District Court, Harris County, Texas.

_____

FILED IN
COURT OF CRIMINAL APPEALS

August 28, 2015

ABEL ACOSTA, CLERK

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**SARAH V. WOOD**
Assistant Public Defender
Harris County, Texas
Texas Bar Number 24048898
1201 Franklin, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278
Sarah.Wood@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                                Ajah Foster

TRIAL PROSECUTORS:                        Melissa Dickson
                                          Assistant District Attorney
                                          Harris County, Texas
                                          1201 Franklin, Suite 600
                                          Houston, Texas 77002


DEFENSE COUNSEL AT TRIAL:                 Beverley Backers
                                          3730 Kirby Drive, Suite 1200
                                          Houston, Texas 77098


PRESIDING JUDGE:                          Hon. Jan Krocker
                                          184th District Court
                                          Harris County, Texas
                                          1201 Franklin, 17th floor
                                          Houston, Texas 77002


DEFENSE COUNSEL ON APPEAL:                Sarah V. Wood
                                          Assistant Public Defender
                                          Harris County, Texas
                                          1201 Franklin, 13th Floor
                                          Houston, Texas 77002

# TABLE OF CONTENTS

Identity of Parties and Counsel ........................................................................... 2

Table of Contents ................................................................................................ 3

Index of Authorities ........................................................................................... 4

Statement Regarding Oral Argument.................................................................. 4

Statement of the Case.......................................................................................... 4

Statement of Procedural History ....................................................................... 5

Ground For Review............................................................................................. 5

> The court of appeals erred by failing to address the appellant's argument that no legitimate trial strategy could exist for failing to object to the use of hearsay as the only affirmative evidence of guilt when it should have been admitted only for impeachment.

Argument.............................................................................................................. 5

    Reasons for Review ...................................................................................... 5

    Factual Background....................................................................................... 5

    Affirmative Evidence vs. Impeachment Evidence...................................... 8

    Failure to Address Argument....................................................................... 9

    No Possible Strategy ................................................................................... 11

Prayer for Relief................................................................................................. 12

Certificate of Service and Compliance.............................................................. 13

Appendix ............................................................................................................ 14

# INDEX OF AUTHORITIES

**Cases**

*Arrick v. State*, 107 S.W.3d 710 (Tex. App.—Austin 2003, pet. ref'd). .............................. 8

*Owens v. State*, 916 S.W.2d 713 (Tex.App.—Waco 1996, no pet.). ................................. 11

*Ramirez v. State*, 987 S.W.2d 938 (Tex. App.—Austin 1999, no pet.). ................................. 11

*Jernigan v. State*, 589 S.W.2d 681 (Tex. Crim. App. [Panel Op.] 1979) .............................. 8

*Smith v. State*, 520 S.W.2d 383 (Tex. Crim. App. 1975) ......................................... 8

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ............................................. 10

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as the issues are interesting and rest on fine distinctions in the law.

## STATEMENT OF THE CASE

On June 19, 2013, seventeen-year-old Ms. Ajah (pronounced "asia") Foster was indicted for assault of a public servant for striking a teacher while he was trying to break up an altercation (C.R. at 11). A month later, she pled guilty to four years of deferred adjudication (C.R. at 22). The State subsequently filed a Motion to Adjudicate and, after a hearing, the trial court found the single allegation of assault to be true and sentenced her to three years in prison (C.R. at 30, 56). This appeal concerns the hearing on the motion to adjudicate.

The Fourteenth Court of Appeals affirmed the trial court's judgment in an unpublished opinion. *Foster v. State,* 14-13-01068-CR, 2015 WL 3631689 (Tex. App.—Houston [14th Dist.] June 11, 2015, no. pet. h.). No motion for rehearing was filed.

## GROUND FOR REVIEW

The court of appeals erred by failing to address the appellant's argument that no legitimate trial strategy could exist for failing to object to the use of hearsay as the only affirmative evidence of guilt when it should have been admitted only for impeachment.

## ARGUMENT

### Reasons for Review

The court of appeals failed to explain its ruling by addressing the appellant's point of error in its opinion.

The court of appeals has permitted such a departure from the accepted course of proceedings in the trial court as to call for this Court to exercise its supervisory capacity.

The decision of the court of appeals conflicts with opinions of this Court and other courts of appeals.

### Factual Background

Seventeen-year-old Ajah Foster's community supervision was revoked after her

boyfriend, Ronald Volley, punched through a window and then initially blamed her for the laceration to his arm. He testified at the hearing that he had made a false report and that she never assaulted him. The only evidence of the assault was the complainant's initial out-of-court statement to the police.

As the court of appeals wrote, an officer "was responding to a call reporting a break-in when he found a bleeding Ronald Volley lying on the ground a few blocks away from the residence reporting the break-in." Ms. Foster's foster-mom had just called the police to report that someone had tried to break in to her house and smashed her window (2 R.R. at 101).

The State called officer Abdala to testify, as the court of appeals noted, that "Abdala learned from [the responding officer's] report that Volley was visiting appellant, his girlfriend, when they got into an argument. According to the report, appellant attacked Volley with a box cutter and cut him on the forearm." Although Abdala was not present the night of the incident, he read extensively from the offense report that was written by another officer.

Trial counsel objected to this testimony, indicating a wish to exclude this double-hearsay. However, her objection was not taken seriously since she complained, "That's not what the offense report says." (2 R.R. at 27). When asked to clarify her objection, she explained, "I'm objecting to the fact that he's going outside of the offense report." (2 R.R. at 28). Abdala then proceeded to recount in detail his recollection of the contents of Volley's statement to him wherein Ms. Foster assaulted him (2 R.R. at 33-

34). Abdala testified that he personally felt that Volley was "reliable and credible" (2 R.R. at 48). However, no investigation was taken of the broken window or Volley's medical records.

Ronald Volley testified affirmatively at the hearing on the motion to adjudicate that Ms. Foster did not assault him. As the court of appeals states, "Volley claimed that he received his injuries by punching the double-paned window in appellant's bedroom. Volley asserted that he left appellant's bedroom through the window, appellant closed the window behind him, and she then refused to allow him back into the bedroom." The couple had been arguing and Volley was very mad about some text messages.

Volley was taken to the hospital and, as the court notes, "The medical records did report that Volley's injuries were lacerations caused by glass."

Ms. Foster herself also testified and denied that she had assaulted Volley, describing how they argued and that he punched the window and ran off (2 R.R. at 130).

Volley freely admitted during the hearing that he had given conflicting accounts of what occurred and that he had initially tried to blame Ms. Foster (2 R.R. at 63). He essentially had two reasons. First, he was afraid because he knew he did something bad by breaking the window. Volley explained, "Because I was scared. I didn't know what to do. I ain't never been in trouble in my life… I ain't know if I was going to jail because they thought I broke into the house." (2 R.R. at 81). Secondly, he was still fuming at Ms. Foster because of her text messages. He said, "I got an anger problem."

7

(2 R.R. at 83). Volley told the court, "Everything I told Abdala was a lie." (2 R.R. at 62).

The court found the allegation of aggravated assault with a box cutter to be true and adjudicated Ms. Foster guilty, sentencing the seventeen-year-old to three years in prison. Additional technical violations that were alleged in the motion to adjudicate were found to be not true (3 R.R. at 20-21).

**Affirmative Evidence vs. Impeachment Evidence**

Despite the fact that the appellant argued to the court of appeals that counsel was ineffective for failing to object to the State's use of the complainant's hearsay statements as affirmative evidence of guilt—when they should have only come in for impeachment purposes, the court illogically held counsel could have had a valid strategy of using the statements for impeachment purposes. Appellant does not dispute that the prior inconsistent statements could have been used to discredit the witness. However, that is not relevant to whether counsel should have objected to their use as affirmative evidence of the allegation.

The sole affirmative evidence of guilt presented by the State was hearsay that could only have been admitted for its impeachment value. It has long been held that, without a valid hearsay exception, impeachment evidence cannot be used as affirmative evidence of guilt. *See, e.g. Jernigan v. State*, 589 S.W.2d 681, 692 (Tex. Crim. App. [Panel Op.] 1979); *Smith v. State*, 520 S.W.2d 383, 386 (Tex. Crim. App. 1975); *Arrick v. State*, 107 S.W.3d 710, 722 (Tex. App.—Austin 2003, pet. ref'd).

A proper objection would have eliminated Mr. Volley's prior statements—not from the record entirely—but from the judge's consideration of guilt. The rationale provided by the Court of Appeals makes clear that it missed the point:

> Appellant's trial counsel could have decided to not object to Abdala's testimony regarding Volley's statements as part of a legitimate trial strategy aimed at discrediting Volley by placing his many differing versions of the events that night before the trial court.

The appellant argued repeatedly and fully in her brief to the court of appeals, "Extrinsic, affirmative evidence regarding the statement dominated the hearing. If trial counsel had objected, the State would only have been permitted to examine Ronald about his statement in order to try to cast doubt on his testimony – not to present hearsay as full-blown evidence."

**Failure to Address Argument**

The court of appeals alluded to the appellant's argument, stating, "Appellant then asserts that if her trial counsel had objected based on hearsay, the State would have had no substantive, affirmative evidence of appellant's guilt." However, the court never addressed it and even after a full briefing on the subject did not seem to grasp the distinction between affirmative evidence and impeachment evidence.

Trial counsel could have accomplished the goal of "discrediting Volley by placing his many differing versions of the events that night before the trial court" without allowing the State to offer these statements as affirmative evidence. Then, not only

would Volley have been discredited, but the State's evidence would also have been legally insufficient (which actually would have made Volley's credibility a moot point).

Rather than address the appellant's argument, the court of appeals recited boilerplate language aimed at disregarding any claim of ineffective assistance in the absence of a motion for new trial. The court wrote, "Appellant acknowledges that she did not file a motion for new trial and thereby provide her trial counsel with an opportunity to explain her reasoning for not objecting to Abdala's testimony reporting Volley's statements."

How could the appellant file a motion for new trial and give counsel an "opportunity" to explain why she failed to exclude the only evidence of guilt when the reporter's record was not even filed until weeks after the motion was due? By requiring a motion for new trial before giving any serious consideration to a claim of ineffective assistance, the court of appeals has effectively barred relief across the board.

The United States Supreme Court has said that in Texas, a motion for new trial "vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point." *Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013). It is simply not fair to blame the appellant for failing to develop the record when it would have been logistically impossible under the rules. Criminal appellants cannot know what grounds to raise without having a transcript of the trial. And yet, it is a matter of course for courts of appeals to lay fault upon the appellant and then simply refuse to consider their argument.

**No Possible Strategy**

As the appellant briefed to the court of appeals, in Ramirez *v. State*, the court found trial counsel to have had no plausible strategy when he failed to object to hearsay under very similar circumstances. *Ramirez v. State*, 987 S.W.2d 938, 946 (Tex. App.—Austin 1999, no pet.). There, the State sought to prove the defendant guilty of assault by calling the recanting complainant to testify that no wrongdoing had occurred and then introducing her prior statement to the police in which she detailed the alleged assault. The State conceded it was hearsay but argued it fit within an exception which the reviewing court rejected. The court explained that the prior statement was touted by the State as the primary evidence of guilt and that no plausible strategy could have caused the trial attorney to fail to object. Likewise, in this case, the complainant's prior statement is the only evidence of guilt. No rationale could exist for allowing the State to admit this evidence.

The appellant also informed the court of appeals that counsel was held ineffective in *Owens v. State* where the complainant testified she had fabricated her accusation of assault and then the State admitted her prior statement without objection. *Owens v. State*, 916 S.W.2d 713 (Tex.App.—Waco 1996, no pet.). There the court held, "There is no plausible strategy to pass over the admission of the only evidence of a defendant's guilt which is also clearly inadmissible as substantive evidence."

Mr. Volley's original, out-of-court statement was the only affirmative evidence

of guilt. If defense counsel had objected, then the State would not have been able to present any affirmative evidence of guilt and the appellant would have won the hearing. Plus, trial counsel could still have fulfilled the strategy touted by the court of appeals by using the hearsay to discredit the witness as impeachment.

The court of appeals said that trial counsel may have had a legitimate trial strategy for failing to object to the only affirmative evidence of guilt. This is like high-fiving a player who scored the winning basket for the wrong team. If counsel had simply objected, appellant's community supervision would not have been revoked.

### PRAYER FOR RELIEF

For the reasons stated above, the Appellant prays that this Court grant her petition, review the case, and hold that the Court of Appeals erred by affirming the trial court's judgment and sentence.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas


**/s/ Sarah V. Wood**
**SARAH V. WOOD**
Assistant Public Defender
Harris County Texas
1201 Franklin, 13th Floor
Houston Texas 77002
(713) 368-0016 (phone)
(713) 368-9278 (fax)
State Bar Number 24048898

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that a copy of the foregoing petition for discretionary review has been served on the District Attorney of Harris County, Texas, by the efile service and to the State Prosecuting Attorney and that this petition has <u>1,954</u> words according to the computer program used to draft it.

<u>/s/ Sarah V. Wood</u>
SARAH V. WOOD

# APPENDIX

2015 WL 3631689
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

DO NOT PUBLISH—TEX. R. APP. P. 47.2(B).
Court of Appeals of Texas,
Houston (14th Dist.

Ajah Marie Foster, Appellant
v.
The State of Texas, Appellee

NO. 14–13–01068–CR | Memorandum Opinion filed June 11, 2015

**On Appeal from the 184th District Court, Harris County, Texas, Trial Court Cause No. 1388752**

**Attorneys and Law Firms**

Sarah Vernier Wood, for Ajah Marie Foster.

Devon Anderson, Alan Curry, Jessica Alane Caird, for the State of Texas.

Panel consists of Justices Jamison, Busby, and Brown.

**MEMORANDUM OPINION**

J. Brett Busby, Justice

**\*1** Appellant Ajah Marie Foster pled guilty to the felony offense of assault against a public servant. The trial court deferred adjudication of guilt and placed appellant on community supervision for four years. The State subsequently filed a motion to adjudicate guilt, alleging that appellant had committed the criminal offense of aggravated assault on her boyfriend. Following a hearing, the trial court adjudicated guilt and sentenced appellant to three years in prison.

In a single issue, appellant argues she is entitled to a new trial because her trial counsel was ineffective for failing to object to hearsay testimony offered during the adjudication hearing. Because appellant has not shown that her trial counsel's failure was so outrageous that no competent attorney would have failed to make the objection, we overrule her sole issue on appeal and affirm the trial court's judgment adjudicating guilt.

**BACKGROUND**

Our record contains the following evidence regarding the aggravated assault violation alleged in the State's motion to adjudicate. On the evening of August 10, 2013, Officer C.C. Benson of the Houston Police Department was responding to a call reporting a break-in when he found a bleeding Ronald Volley lying on the ground a few blocks away from the residence reporting the break-in. According to Benson's report, Volley told Benson that his girlfriend had assaulted him with a box cutter. Volley was taken by ambulance to the hospital, where he was treated for a severe laceration to

his right forearm and other, less severe, injuries.

Raul Abdala, a family violence investigator with the Houston Police Department, was assigned to investigate the assault. Abdala testified during the adjudication hearing that the first thing he did after being assigned the case was to review Benson's report. Abdala learned from Benson's report that Volley was visiting appellant, his girlfriend, when they got into an argument. According to the report, appellant attacked Volley with a box cutter and cut him on the forearm. Volley then jumped through appellant's bedroom window to escape. Abdala also learned that Volley fled the scene and collapsed a short distance away as a result of blood loss caused by his injuries. At this point in Abdala's testimony, appellant's trial counsel objected that: (1) Abdala's testimony exceeded the information contained in Benson's report; (2) Abdala's testimony was not responsive; and (3) the prosecutor's question was leading. The trial court did not expressly rule on appellant's objections but instead instructed the witness to answer the question asked and also suggested that appellant's defense counsel could address her concerns through cross-examination.

Abdala then testified that after he had reviewed the file, he contacted Volley and asked him to come to the police station to give a statement about the incident. Volley came to the station four days later and gave a recorded statement regarding the episode that resulted in his injuries. In this statement, Volley confirmed that he and appellant were in a dating relationship at the time of the event. He also said that he was visiting appellant when he saw a text message on her phone that angered him. At that point, Volley told appellant that he was going to visit another female. Appellant became upset and then said that if she could not have Volley, "no one would[.]" Volley then said that appellant pulled a green box cutter from a drawer and began punching and slicing at him. Volley reported that appellant cut his forehead and made several cuts on his arm with the box cutter. Volley then said that he dove headfirst through appellant's closed bedroom window to get away from appellant's attack. Volley admitted that he broke the window's glass in the process. Once outside, Volley reported that he ran away from appellant's house.

*2 While at the station, Volley gave Abdala two digital photographs of his injuries. Abdala observed that Volley had no injuries to his left arm as he would have expected if Volley had been injured as a result of going through a closed window.

Abdala testified that Volley called back a few days later and recanted his initial report that appellant had cut him with a box cutter. Volley claimed that he had lied to the investigator. Abdala told Volley he could come in and give a second statement, but reminded him to be careful not to perjure himself. Volley did not return to the police station and never gave a second statement.

Abdala contacted appellant by telephone soon after visiting with Volley. Abdala offered appellant the opportunity to provide a statement about the incident. Appellant agreed to come to the police station to talk with Abdala. Appellant never appeared, however, nor did she contact Abdala to make other arrangements for providing her statement.

Abdala obtained and reviewed Volley's hospital medical records. According to Abdala, the records showed that Volley had suffered a large laceration that went down to the bone on his right wrist, causing nerve and tendon damage. The records also showed that Volley had two smaller lacerations on his right forearm. A few days later, the investigator presented the case for charges, explaining that he pursued the case because he found Volley's original statement reporting an assault credible and he believed the incident had occurred despite Volley's attempt to recant. Abdala testified that he believed Volley's injuries were consistent with injuries that could be made by a box cutter.

Volley also testified during the hearing. Volley confirmed that he had a dating relationship with appellant at the time of the events at issue in the hearing. Volley also testified that he and appellant were together in appellant's bedroom when the incident occurred. Volley stated he usually came and went from appellant's house by way of the front door. Volley claimed that while he was in appellant's bedroom, he saw a text on appellant's phone that upset him and they argued. After arguing for some time, Volley told appellant he would go home, and he may have indicated that he planned to go see another woman as well. Volley then called appellant an offensive word, and appellant responded by trying to strike him in the face. Volley testified that he dodged the blow. The prosecutor then attempted to confront Volley with his prior statement to Abdala that appellant had punched him five times. Volley denied that he ever said appellant struck him five times, but he did admit telling Abdala that appellant had punched him.

Volley further testified that he had lied throughout his statements to Abdala and Benson. The prosecutor then questioned Volley about details he provided in his oral statement, which were consistent with his statements to Benson

at the scene. For example, Volley included the color of the box cutter in his statement. Volley claimed he lied to Abdala because he was still mad at appellant over the text message and also because he feared his mother would be angry if she found out that he lied initially about how he had been injured.

**\*3** During the hearing, Volley claimed that he received his injuries by punching the double-paned window in appellant's bedroom. Volley asserted that he left appellant's bedroom through the window, appellant closed the window behind him, and she then refused to allow him back into the bedroom. When asked why he left by the window on this occasion when he had testified that he normally entered and left appellant's house through the front door, Volley had no explanation. Volley claimed that he punched the window because appellant called his mother a name. Volley explained that he ran after breaking appellant's window because he had never done anything like that before and he was afraid of getting into trouble.

In his testimony, Volley initially claimed that he told Officer Benson nothing about the incident. Volley then denied telling Benson that appellant had cut him with a box cutter. Volley did admit to telling Benson that he did not want to press charges against anyone. Volley said he did not remember telling Benson anything because he felt woozy and sleepy, as though he was dying. Volley also admitted that, in giving a reason why he did not want to press charges, he had falsely told Abdala that appellant was pregnant.

Volley admitted telling hospital personnel that his girlfriend had pushed him out a window, causing his injuries. Volley explained that he made that story up because he did not want the medical personnel at the hospital prying into his business. Volley denied that this version of the episode was true. The medical records did report that Volley's injuries were lacerations caused by glass. The records also showed that the surgeries to repair Volley's injuries did not find any foreign matter in the wounds.

On cross-examination, appellant's trial counsel went through each version of the story Volley had told regarding the episode and how he had sustained his injuries. In one version, Volley claimed that his hand accidentally went through appellant's window while he and appellant were playing outside the house. In a second version, Volley claimed that he and appellant were boxing and he was injured when he dodged away from a blow. In a third version of the episode, Volley stated that he deliberately punched the window out of anger when appellant failed to open it at his request. In a fourth version, which Volley initially told to Benson and then to Abdala, Volley reported that appellant had stabbed him. In a fifth version, Volley told hospital personnel that appellant had pushed him through a window. Finally, in a sixth version of events, Volley claimed that he deliberately jumped through appellant's closed window.

The testimony culminated with appellant's counsel asking Volley why the trial court should believe anything he said after he had changed his story so many times? Volley answered "I don't know." Volley finally claimed that he had "come up with the last one [that he punched the glass] because, I mean, it's wrong, she ain't supposed to be up here and I'm so sorry." Volley claimed to have anger problems and asserted that he made up the differing stories to keep himself out of trouble for breaking a window and thereby injuring himself.

Appellant also called Volley's mother to testify. She testified that two or three days after the incident, Volley confessed that he had lied about appellant cutting him with a box cutter. Volley's mother continued that her son's injuries included four lacerated tendons, a cut to his forehead, and several cuts on his forearm. She stated that Volley had never been violent with her, but he did have a temper that caused him to lash out with words.

Appellant's foster mother, Barbara Miles, also testified during the hearing. Miles testified that on the night of the incident, she heard glass break. Believing someone had tried to break in, Miles had called the police. Miles testified that she saw blood on broken glass in appellant's bedroom and claimed the following day that she saw only a little glass lying in her backyard. Miles believed the majority of the glass from the broken window had landed in appellant's bedroom. From this, she concluded someone had hit the window, but she thought the hole would have been bigger had someone tried to punch the glass from the inside or had actually gone through the window. Miles testified that appellant had taken photographs of the broken glass, but Miles claimed the photographs were not available for the hearing. Miles claimed Volley had confessed to her that he had punched the window, but not until several days after the incident. Miles admitted that she was completely unaware of the relationship between appellant and Volley prior to appellant's window being broken. Miles also testified that she did not meet Volley until after the incident, when she and appellant encountered him walking back and forth near their house. Finally, Miles testified that she did not hear an argument that night or any commotion until she heard the glass breaking. Miles reported that she was awake

and watching a movie with her other children at the time.

**\*4** Appellant's grandmother, Marcia Foster, testified about appellant's probation meetings, fees, fines, and employment search. Foster admitted that appellant had a bad temper, and that she had previously called the police on appellant when she had custody of appellant.

Appellant testified that she did not stab Volley. She claimed Volley mentioned seeing another woman, she told him to leave her bedroom, he left through the window, and she closed it. Appellant testified that Volley returned a few minutes later, knocked, and gestured for her to open the window, but she refused. Unable to open the window, Volley punched it, breaking one of the panes and damaging the second pane before he ran off. When asked about the broken window after police arrived, appellant told them someone had struck it, but she did not identify Volley as the person who had done so for fear that he would get into trouble. Appellant acknowledged that she had punched Volley in the past. She also admitted that Volley was not the type of person who would ever punch back. Appellant claimed that she previously hit Volley because he had provoked her. Appellant admitted that she had never told her foster mother that she was dating Volley because she did not believe Miles would have approved of him. Appellant also admitted that she had allowed Volley to stay the night in her room, just not as often as Volley or his mother had claimed.

During closing argument, appellant's trial counsel focused on Volley's lack of credibility and the numerous inconsistencies in his accounts of the incident. Counsel argued that Volley's injuries were more consistent with glass cuts rather than lacerations from a box cutter. In response, the State stressed the similarities between appellant's first two reports of how he sustained his injuries, including his specific description of the box cutter. The State also stressed the physical evidence, including where the bulk of the glass and blood fell, which it argued supported Volley's stabbing version of events. The State also argued that the location of Volley's wounds appeared more consistent with injuries caused by a box cutter rather than by punching a window. The State stressed Volley's motivations for lying to the trial court, including his continued affinity for appellant. Finally, the State pointed out the timing of Volley changing his explanation of what happened, emphasizing that it occurred the day after Abdala talked to appellant and asked her to come in and give a statement.

At the conclusion of the hearing, the trial judge found that appellant had committed a new law violation by using a box cutter to cause Volley's injuries. The trial court then revoked appellant's probation and sentenced her to serve three years in prison. Appellant did not file a motion for new trial but instead filed a notice of appeal.

## ANALYSIS

In a single issue, appellant contends that her trial counsel rendered ineffective assistance when she failed to object to hearsay testimony offered by investigator Abdala reporting Volley's out-of-court statements.

### I. Standard of review

In reviewing claims of ineffective assistance of counsel, we apply a two-prong test. *See Salmas v. State,* 163 S.W.3d 734, 740 (Tex.Crim.App.2005) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). To establish ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) his trial counsel's representation was deficient in that it fell below the standard of prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Id.*

**\*5** An accused is entitled to reasonably effective assistance of counsel. *King v. State,* 649 S.W.2d 42, 44 (Tex.Crim.App.1983); *Bradley v. State,* 359 S.W.3d 912, 916 (Tex.App.–Houston [14th Dist.] 2012, pet. ref d). Reasonably effective assistance of counsel does not mean error-free representation, however. *Ex parte Felton,* 815 S.W.2d 733, 735 (Tex.Crim.App.1991). Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination. *Wert v. State,* 383 S.W.3d 747, 753 (Tex.App.–Houston [14th Dist.] 2012, no pet.). Therefore, when evaluating a claim of ineffective assistance, the appellate court looks to

17

the totality of the representation and the particular circumstances of the case without the benefit of hindsight. *Lopez v. State,* 343 S.W.3d 137, 143 (Tex.Crim.App.2011); *Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App.1999).

There is a strong presumption that trial counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *Salinas,* 163 S.W.3d at 740. It is not sufficient that an appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence. *Lopez,* 343 S.W.3d at 143. Instead, in order for an appellate court to conclude that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record and the court must not engage in retrospective speculation. *Id.* at 142. When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. *Id.* at 143.

Trial counsel should ordinarily be afforded an opportunity to explain her actions before being denounced as ineffective. *Menefield v. State,* 363 S.W.3d 591, 593 (Tex.Crim.App.2012). Unless trial counsel has had an opportunity to give specific explanations for her decisions, a record on direct appeal will rarely contain sufficient information to evaluate an ineffective assistance claim. *Bone v. State,* 77 S.W.3d 828, 833 (Tex.Crim.App.2002). When no reasonable trial strategy could justify trial counsel's conduct, however, trial counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects trial counsel's subjective reasons for acting as she did. *Andrews v. State,* 159 S.W.3d 98, 102 (Tex.Crim.App.2005). The Court of Criminal Appeals has observed that it is a rare case in which trial counsel's ineffectiveness is apparent from the record and an appellate court may address and dispose of the claim on direct appeal. *Lopez,* 343 S.W.3d at 143. The court declared that it is a "difficult hurdle to overcome: the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.* In other words, when trial counsel has not had an opportunity to explain his or her actions or inactions, an appellate court cannot find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex.Crim.App.2005).

### II. Appellant has not established that her trial counsel's performance was deficient as a result of her failure to object to hearsay testimony.

Appellant argues her trial counsel was ineffective because she did not object to hearsay testimony offered by Abdala regarding Volley's statements that appellant had cut him with a box cutter. Appellant acknowledges that she did not file a motion for new trial and thereby provide her trial counsel with an opportunity to explain her reasoning for not objecting to Abdala's testimony reporting Volley's statements. Appellant then goes on to argue that her case is one of those rare direct appeals in which this court can hold her trial counsel ineffective despite the lack of a record because no competent attorney would have failed to object to the hearsay testimony. Appellant then asserts that if her trial counsel had objected based on hearsay, the State would have had no substantive, affirmative evidence of appellant's guilt.

**\*6** In *Darkins v. State,* we recently addressed a similar argument regarding a failure to object to hearsay testimony. 430 S.W.3d 559, 570–71 (Tex.App.–Houston [14th Dist.] 2014, pet. ref'd). There, we stated that "failures to object to potentially inadmissible testimony are not sufficient, in themselves, to constitute deficient performance." *Id.* at 571. We also recognized that "plausible reasons exist for not objecting to hearsay." *Id.*

We conclude that is the case here. Appellant's trial counsel could have decided to not object to Abdala's testimony regarding Volley's statements as part of a legitimate trial strategy aimed at discrediting Volley by placing his many differing versions of the events that night before the trial court. *See McKinny v. State,* 76 S.W.3d 463, 473 (Tex.App.–Houston [1st Dist.] 2002, no pet.) (stating that an attorney may decide to not object to inadmissible evidence for strategic reasons); *Henderson v. State,* 704 S.W2d 536, 538 (Tex.App.–Houston [14th Dist.] 1986, pet. ref'd) ("Failing to object to every introduction of improper evidence or questioning does not indicate that appellant's representation was ineffective. Not objecting can be a trial strategy.").

Because appellant has not established that her trial counsel's failure to object was so outrageous that no competent attorney would have decided to not object, we hold she has not met the first *Strickland* prong. *See Ortiz v. State,* 93 S.W.3d 79, 88–89 (Tex.Crim.App.2002) ("If counsel's reasons for his conduct do not appear in the record and there

18

is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."); *Johnson v. State,* 176 S.W.3d 74, 79 (Tex.App.–Houston [1st Dist.] 2004, pet. ref'd) (stating that simply because a trial strategy does not work does not mean that trial counsel was ineffective). We therefore overrule appellant's single issue on appeal.

## CONCLUSION

Having addressed and rejected appellant's only issue on appeal, we affirm the trial court's judgment adjudicating guilt.

**All Citations**

Not Reported in S.W.3d, 2015 WL 3631689

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.